J-A01030-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| TOBY MALLOY | : | |
| | : | |
| Appellant | : | No. 1126 EDA 2020 |

Appeal from the Judgment of Sentence Entered February 24, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001954-2019

BEFORE: BENDER, P.J.E., OLSON, J., and STRASSBURGER, J.[*]

MEMORANDUM BY OLSON, J.: **FILED: APRIL 19, 2021**

Appellant, Toby Malloy, appeals from the judgment of sentence entered on February 24, 2020 in the Criminal Division of the Court of Common Pleas of Philadelphia County. We vacate and remand.

Appellant was arrested on February 28, 2019 and charged with possession of a firearm without a license, 18 Pa.C.S.A. § 6106, and carrying a firearm on a public street in Philadelphia, 18 Pa.C.S.A. § 6108. Prior to a stipulated bench trial, Appellant moved to suppress a firearm and certain statements he made to law enforcement officers. On February 24, 2010, the trial court convened a hearing on the suppression motion and, thereafter, made the following findings of fact in a written opinion prepared pursuant to Pa.R.A.P. 1925(a).

---

[*] Retired Senior Judge assigned to the Superior Court.

On February 24, 2020, [the trial c]ourt held an evidentiary hearing on [Appellant's] motion to suppress, through which [Appellant] sought to suppress a firearm and his statements to law enforcement. At the hearing, the Commonwealth presented the testimony of Philadelphia Police Officer Stephen Henry, which [the trial c]ourt found to be credible based on his demeanor and the substance of his uncontradicted testimony. The evidence at the hearing established the following facts.

During the early morning of February 28, 2019, Officer Henry was on routine patrol near the 1100 block of Olney Avenue in Philadelphia. At approximately 3:00 a.m., after noticing that a passing car appeared not to have a license plate, Officer Henry activated his patrol car's lights and sirens and pulled over the vehicle. As he walked towards it, Officer Henry saw a license tag on the car's rear windshield. He noticed that the tag was not properly displayed and secured, which he knew to be a violation of Pennsylvania's [Motor] Vehicle Code[, 75 Pa.C.S.A. § 1332 (display of registration plate)]. Officer Henry also observed several occupants within the car, including [Appellant], who was seated in the rear behind the driver. Officer Henry approached the driver and told him that the car did not have a license plate on the back. The driver responded that he had [obtained the car just two] days prior and still needed to get screws for the license plate.

Continuing his investigation, Officer Henry asked [Appellant] to roll down the passenger window on the driver's side. He then asked [Appellant] for identification, and [Appellant] responded by moving to pull a lanyard out from his hooded sweatshirt. When Officer Henry saw the lanyard, he immediately asked [Appellant] if he had a firearm on him. Officer Henry asked the question because, in his experience, it was common for people who worked in armed security positions at local bars to keep their identification badges in lanyards. [Appellant] answered that he did have a firearm and further explained that he had it because he worked in a security position at a bar named Bananas, where he and the other occupants of the car had just finished working for the day. Officer Henry was familiar with the bar and knew it to be a legitimate establishment that employed security guards. When Officer Henry asked where the firearm was located, [Appellant] responded that it was on his right hip. At that point, for his own

safety and for the safety of the vehicle's other occupants, Officer Henry asked [Appellant] to exit the vehicle so that he could secure the firearm before continuing with his investigation. Officer Henry testified that it was routine for police officers to remove someone from a vehicle upon learning that the person was in possession of a weapon.

At the time Officer Henry secured the weapon, he again asked [Appellant] for his identification documents.[1] [Appellant] responded by giving Officer Henry and "Act 235" card.[FN1] However, when Officer Henry reviewed the card, he noticed that the card had expired in September of 2013. [Appellant] claimed that he had another Act 235 card at home. Over the next 15 to 20 minutes, Officer Henry proceeded to run checks on [Appellant] to determine whether he had a valid Act 235 card or a license to carry [a firearm], including by contacting local detectives and the Pennsylvania State Police. The checks run by Officer Henry revealed that [Appellant's] Act 235 certification had expired.

---

[1] At the conclusion of the suppression hearing, the trial court recited findings of fact on the record which offered a more detailed description of the type of documents Officer Henry requested from Appellant after the officer secured the firearm. In these findings, the court stated that, "Officer Henry asked [Appellant] for documents showing he was authorized to have a firearm." N.T. Suppression Hearing, 2/24/20, at 40. Read in context, Officer Henry's testimony confirms that he asked Appellant to produce firearms credentials, not simply generic identification documents, once he learned that Appellant possessed a gun and asked Appellant to exit the vehicle. The following exchange occurred at the suppression hearing.

> **[Commonwealth]:** When you say he [stated he had a firearm on him], who do you mean?
>
> **[Officer Henry]:** [Appellant]. So I asked him where it was. He said it was on his right hip. I asked him out of the vehicle. I secured the firearm. I asked him for his documents. And from there, we ran him through [certain criminal databases, including the National Crime Information Center and Pennsylvania Criminal Intelligence Center]. We did our normal checks. And the Act 235 card he provided had a – it said expired in, I believe it was September of 2013.

N.T. Suppression Hearing, 2/24/20, at 10.

- 3 -

Officer Henry arrested [Appellant] on charges related to the unlawful possession of a firearm but did not issue a citation to the driver of the vehicle, who had provided documentation establishing that he had just recently purchased the vehicle, consistent with his prior statements.

> [FN1] Act 235 refers to the Lethal Weapons Training Act, which was enacted to provide for the "education, training, and certification of such privately employed agents who, as an incidence to their employment, carry lethal weapons." Act. No. 1974-235, P.L. 705 (Oct. 10, 2974, 22 P.S. § 42(b).

Trial Court Opinion, 6/8/20, at 2-4 (footnote in original; record citations omitted).

At the conclusion of the hearing, the trial court denied suppression and Appellant proceeded to his stipulated bench trial on the same day. The court found Appellant guilty of the above-referenced charges and sentenced him to five years of reporting probation.

Appellant filed a timely appeal and, pursuant to order of court, a timely concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(b). The court issued its Rule 1925(a) opinion on June 8, 2020.

In his brief, Appellant raises the following question for our review.

Should not the firearm and Appellant's statements have been suppressed as fruits of the poisonous tree where police illegally prolonged a routine traffic stop without reasonable suspicion to conduct an unrelated investigation into whether [Appellant] was legally allowed to carry a firearm?

Appellant's Brief at 3.

Appellant alleges on appeal that the trial court erred in denying his motion to suppress certain statements and a firearm recovered from him following the traffic stop that occurred on February 28, 2019.

Our standard and scope of review is as follows.

[In reviewing an order that denied a motion to suppress, an appellate court must determine] whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Benitez*, 218 A.3d 460, 469-470 (Pa. Super. 2019) (citation omitted).

On appeal, Appellant concedes that Officer Henry possessed lawful justification to initiate the February 28, 2019 traffic stop and to undertake certain additional actions related to officer safety and Motor Vehicle Code enforcement. Nevertheless, Appellant asserts that Officer Henry improperly prolonged the stop when he detained and questioned Appellant's legal authority to possess a firearm in the absence of reasonable suspicion that

Appellant had engaged in criminal activity. As such, Appellant claims that the trial court erred in denying his motion to suppress.

For its part, the trial court concluded that Officer Henry did not unlawfully prolong the traffic stop, finding that the duration of the stop was reasonable and that Officer Henry's questions regarding Appellant's authority to carry a firearm were justified by concerns for officer safety and constituted ordinary lines of inquiry incident to a traffic stop which police officers are permitted to pursue. **See** Trial Court Opinion, 6/8/20, at 7-8. In the alternative, the trial court concluded that Officer Henry had reasonable suspicion to support a separate investigative detention relating to Appellant's possession of the firearm. **See id.** at 8.

We begin our analysis by reviewing the February 28, 2019 traffic stop.[2] On February 28, 2019 at approximately 3:00 a.m., Officer Henry was on routine patrol when he observed a vehicle that did not have a license plate affixed to it. Based upon this observation, Officer Henry positioned his cruiser behind the vehicle and activated his lights and sirens to summon the vehicle to a stop. After the vehicle came to rest, Officer Henry approached the car and proceeded to speak to the driver and, subsequently, Appellant.

_____

[2] We realize that Appellant does not challenge the legality of the stop. Nevertheless, we shall review the circumstances surrounding the stop because they impact the inferences and legal conclusions we draw in the context of subsequent interactions that occurred in this episode.

When a police officer forcibly stops a motor vehicle, the stop constitutes a "seizure" within the meaning of the Fourth Amendment and activates constitutional protections against unreasonable searches and detentions. *Whren v. United States*, 517 U.S. 806, 809–810 (1996). In *Commonwealth v. Feczko*, 10 A.3d 1285 (Pa. Super. 2010) (*en banc*), *appeal denied*, 25 A.3d 327 (Pa. 2011), this Court addressed the requisite legal justification for a traffic stop undertaken to enforce an alleged violation of the Motor Vehicle Code. We referred initially to the relevant statutory authority found at 75 Pa.C.S.A. § 6308(b), which states:

> **(b) Authority of police officer.**—Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

*Feczko*, 10 A.3d at 1287, *quoting* 75 Pa.C.S.A. § 6308(b). Ultimately, we observed:

> In light of [the Pennsylvania] Supreme Court's interpretation of the current language of Section 6308(b), we are compelled to conclude that the standards concerning the quantum of cause necessary for an officer to stop a vehicle in this Commonwealth are settled[.] Traffic stops based on a reasonable suspicion: either of criminal activity or a violation of the Motor Vehicle Code under the authority of Section 6308(b) must serve a stated investigatory purpose. [*See Commonwealth v. Chase*, 960 A.2d 108, 116 (Pa. 2008)]. In effect, the language of Section 6308(b)—"to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title"—is conceptually equivalent with the underlying purpose of a [stop

conducted pursuant to [*Terry v. Ohio*, 392 U.S. 1 (1968). *See Chase*, 960 A.2d at 116, *quoting* 75 Pa.C.S. § 6308(b).]

Mere reasonable suspicion will not justify a vehicle stop when the driver's detention cannot serve an investigatory purpose relevant to the suspected violation. In such an instance, "it is [incumbent] upon the officer to articulate specific facts possessed by him, at the time of the questioned stop, which would provide probable cause to believe that the vehicle or the driver was in violation of some provision of the [Motor Vehicle] Code." [*Commonwealth v. Gleason*, 785 A.2d 983, 989 (Pa. 2001) (superseded by statute) (citation omitted); *see also*] *Chase*, 960 A.2d at 116 (reaffirming *Gleason*'s probable cause standard for non-investigative detentions of suspected Vehicle Code violations).

*Feczko*, 10 A.3d at 1290-1291 (footnotes omitted).

Officer Henry initiated the traffic the stop in this case after he observed that the vehicle which Appellant occupied did not appear to have a license plate affixed to it. *See* N.T. Suppression Hearing, 2/24/20, at 8 and 11-12. In fact, the officer's testimony at the suppression hearing established that, at the time he commenced the stop, he immediately recognized that the vehicle was not in compliance with the Motor Vehicle Code. *See id*. at 8 and 12 ("the vehicle . . . was in violation of the [M]otor [V]ehicle [C]ode [since the license plate] wasn't properly secured and it wasn't properly displayed" ); *see also* 75 Pa.C.S.A. § 1332 ("Every registration plate shall, at all times, be securely fastened to the vehicle to which it is assigned or on which its use is authorized in accordance with regulations promulgated by the department."). Since the observed violation did not require further investigation, Officer Henry needed

probable cause to support a constitutionally valid traffic stop.[3]  Therefore, at the suppression hearing, Officer Berry was required to "articulate specific facts possessed by him, at the time of the questioned stop, which would provide probable cause to believe that the vehicle or the driver was in violation of some provision of the Code." *Feczko*, *supra*.  Based on the record developed at the suppression hearing, we conclude that Officer Henry's observations, as set forth above, provided probable cause to believe that the vehicle in which

_____

[3] Although the trial court's written opinion did not address the requisite showing needed to support the traffic stop in this case, the conclusions of law offered by the court at the end of the suppression hearing included the following remarks about the justification for the initial vehicle detention:

> Here, when Officer Henry observed that the vehicle in question did not appear to have a tag properly affixed to it[,] **he had reasonable suspicion to stop the car and determine if there was a [M]otor [V]ehicle [C]ode violation**.

N.T. Suppression Hearing, 2/24/20, at 41-42 (emphasis added).

The trial court's statement of the applicable constitutional standard is erroneous.  In *Feczko*, we explained that an officer must have probable cause to make a constitutionally valid traffic stop "where there is nothing further to investigate." *Feczko*, 10 A.3d at 1290, *quoting Chase*, 960 A.2d at 115-116. In contrast, traffic stops supported by reasonable suspicion must serve a stated investigatory purpose, whether that purpose is to investigate ongoing criminal activity or a violation of the Motor Vehicle Code under the authority of Section 6308(b). *Feczko*, 10 A.3d at 1291.  In this case, as we shall explain in greater detail above, Officer Henry's initial observations, which showed a vehicle without a properly affixed license plate, were sufficient to demonstrate probable cause to support the stop.  Probable cause, not reasonable suspicion, furnished the appropriate legal standard because further investigation was unlikely to add anything more in establishing a violation of Section 1332 of the Motor Vehicle Code.

Appellant was a passenger was not in compliance with Section 1332 of the Motor Vehicle Code.

Having concluded that Officer Henry possessed valid constitutional grounds to initiate the traffic stop, we turn now to consider Appellant's claim that Officer Henry unlawfully prolonged the detention. The United States Supreme Court has outlined the following relevant principles:

> [T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.
>
> [A] traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket.... An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But ... he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.
>
> Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

**Rodriguez v. United States**, 575 U.S. 348, 354 (2015) (citations omitted).

In sum, within the context of a lawful traffic stop, **Rodriguez** permits "mission related" inquiries addressed to the traffic violations which originally

- 10 -

prompted the detention, as well as incidental inquiries aimed at ensuring the safe and responsible operation of vehicles on the highway. *See id*. This latter category includes such things a "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*.

Out of concern for officer safety, Pennsylvania search and seizure jurisprudence also permits certain limited intrusions upon the liberty of passengers in lawfully detained vehicles. Hence, officers may order passengers to remain in a car for the duration of a lawful stop. *See Commonwealth v. Pratt*, 930 A.2d 561, 567 (Pa. Super. 2007) ("police officer may lawfully order a passenger who has exited and/or attempted to walk away from a lawfully stopped vehicle to re-enter and remain in the vehicle until the traffic stop is completed[] without offending the passenger's rights under the Fourth Amendment"), *appeal denied*, 946 A.2d 686 (Pa. 2008). Law enforcement officials may also inquire about the presence of weapons. *See Commonwealth v. Clinton*, 905 A.2d 1026, 1031 (Pa. Super. 2006) (officer's inquiry regarding presence of weapons during lawful traffic stop reasonably furthered interest in officer safety and constituted tolerable, minimal intrusion), *appeal denied*, 934 A.2d 71 (Pa. 2007). Lastly, police officials may compel passengers to exit a lawfully stopped vehicle. *See Commonwealth v. Rodriguez*, 695 A.2d 864, 868-869 (Pa. Super. 1997) (Fourth Amendment permits police to ask both drivers and passengers to

alight from lawfully stopped vehicles without reasonable suspicion that criminal activity is afoot). The authority to carry out these actions do not, in and of themselves, expand the grounds for detaining or investigating passengers who are merely present in a lawfully stopped vehicle. *See Maryland v. Wilson*, 519 U.S. 408, 413-415 (1997) (reasoning that officer's authority to order passengers out of lawfully stopped vehicle stems from potential safety risks to officers and not from independent grounds to detain passengers).

As stated above, the trial court offered two alternate reasons for denying suppression. Initially, the court, citing *Rodriguez*, concluded that, "the firearms license and Act 235 checks run by [Officer Henry] during the traffic stop [were] comparable to the other kinds of checks, unrelated to underlying traffic infractions, that officers are permitted to conduct during traffic stops, such as check on whether a driver has outstanding warrants." Trial Court Opinion, 6/8/20, at 7-8. We are unable to agree with this legal assessment.

While on patrol on the night in question, Officer Henry summoned the vehicle occupied by Appellant to stop after he immediately recognized that the vehicle was in violation of Section 1332 of the Motor Vehicle Code because its license plate was not properly displayed. On approach, Officer Henry discovered that the license plate was affixed to the car's rear windshield, suggesting that a recent vehicle transfer had occurred. From these circumstances, we infer that the "mission-related" inquiries Officer Henry

needed or intended to undertake focused not on whether a traffic violation had occurred, as his observations had already established, but on whether any circumstances (such as a recent vehicle acquisition) where present which would permit the officer, in his discretion, to issue a warning instead of a traffic citation. Officer Henry's ensuing discussions with the driver, which occurred before his interactions with Appellant,[4] support this inference:

> **[Commonwealth]:** When did you – you said you first noticed [the license plate] as you were approaching from the rear. How is it that you noticed it then but not when you were in your car?
>
> **[Officer Henry]:** Just the angle. It's a typical place. It's supposed to be placed right there on the back secured with screws. And talking to the driver he said he didn't have any screws when he bought the car so he still had to buy them.
>
> **[Commonwealth]:** Based on finding the tag in the rear [] window or observing it in the rear [] window on your approach what, if any, further investigation did you intend to do at that point?
>
> **[Officer Henry]:** We still [want] to conduct the vehicle investigation because he still was in violation of the [M]otor [V]ehicle [Code. The license plate] wasn't properly secured and it wasn't displayed properly. Still just conducted a normal traffic stop.

---

[4] The following exchange occurred on cross-examination of Officer Henry at the suppression hearing.

> **[Defense Counsel]:** That conversation [between Officer Henry and the driver regarding the driver's vehicle purchase documentation] happened before you ever [spoke] to [Appellant], correct?
>
> **[Officer Henry]:** Yes.

*See* N.T. Suppression Hearing, 2/24/20, at 14.

[Commonwealth]: And [the driver's] explanation was sufficient eventually that the tag was legitimate?

[Officer Henry]: Yes. He had documentation. He had his pink slip showing he just bought [the car]. And it didn't seem like he was trying to hide anything.

[Commonwealth]: Did that conclude your role in this investigation of [Appellant] here with us today and that car, in general, back in 2019?

[Officer Henry]: Yes.

N.T. Suppression Hearing, 2/24/20, at 12-13.

Arguably, since Officer Henry appears to have received documentation showing the driver's recent acquisition of the vehicle before he asked Appellant for identification, the transcript suggests that Officer Henry may have uncovered all the information he needed to determine whether to issue a warning or a citation, and thus resolved all mission-related inquiries, before he even commenced any interaction with Appellant. Nevertheless, the transcript, which is less than definitive, suggests that a very short time interval passed between the moment Officer Henry obtained the driver's pink slip and when he initiated an interaction with Appellant. For the sake of argument, then, we shall assume that Officer Henry's efforts to verify the driver's license, determine the existence of outstanding warrants against the driver, and confirm the automobile's registration and proof of insurance were ongoing when he requested identification from Appellant and that mission-related tasks could not reasonably have been concluded by that time.

- 14 -

After Officer Henry concluded his discussions with the driver, he asked Appellant (who was seated in the back seat behind the driver) for his identification. *See* N.T. Suppression Hearing, 2/24/20, at 9. In response, Appellant went to pull a neck lanyard out of his hooded sweatshirt. *See id.* Based upon his patrol experience, Officer Henry was aware that security personnel at local bars and night clubs often kept their identification cards on lanyards and, furthermore, that such workers often possessed firearms.[5] *See id.* Officer Henry, therefore, asked Appellant if he possessed a firearm. *See id.* Appellant confirmed that he worked at a local night club known to Officer Henry and that he had a gun holstered on his right hip. *See id.* at 10. Officer Henry then asked Appellant to step out of the vehicle and, after Appellant complied, Officer Henry secured the weapon. *See id.* Officer Henry then asked Appellant for documentation authorizing possession of the firearm and Appellant produced an Act 235 card that expired in September 2013. *See id.* at 10-11. While Officer Henry undertook a 10- to 15-minute investigation to determine whether Appellant possessed a valid firearms credential, Appellant explained that he had a valid Act 235 card at his home. *See id.* at 11. After consulting various law enforcement databases, local detectives, and the state

---

[5] Officer Henry was also mindful of the fact that the stop occurred at 3:00 a.m., when many night club workers ended their shifts. *See* N.T. Suppression Hearing, 2/24/20, at 9.

police, Officer Henry was unable to uncover evidence that Appellant had a valid Act 235 card.  *See id.* at 11.

The trial court concluded that Officer Henry's request for documentation of Appellant's authority to carry a firearm constituted an ordinary inquiry incident to the traffic stop that police officers are permitted to make.  We disagree.

In *Rodriguez*, the United States Supreme Court enumerated several inquiries which, in addition to "mission-related" requests,[6] are permitted because they ensure that vehicles are operated safely and responsibly.  These inquiries, which focus on documentation pertaining to the driver and the detained vehicle, "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Rodriguez*, 575 U.S. at 354.  Here, neither the trial court nor the Commonwealth cite legal authority which equates an investigation of a passenger's documented authority to carry a firearm to the incidental inquiries permitted during a lawful traffic stop under *Rodriguez* and which promote safe and financially responsible operation of motor vehicles.  More tellingly, neither the trial court nor the Commonwealth offer any explanation as to how or why a passenger's firearms licensure status

---

[6] The trial court did not deny suppression on grounds that Officer Henry's request for Appellant's firearms documentation constituted a "mission-related" inquiry.

- 16 -

relates to these incidental inquiries or, more broadly, to the safe and financially responsible operation of a motor vehicle in general. We are convinced that a passenger's legal authority to own or possess a firearm is simply unrelated to a driver's authority to operate a motor vehicle, the existence of outstanding warrants against the driver, and whether a lawfully detained vehicle is properly registered or insured. As such, we reject the trial court's conclusion that Officer Henry's request for Appellant's documented firearms authorization could be pursued as incidental to the traffic stop herein.

We also reject the suggestion that Officer Henry's request fell within the limited class of minimally intrusive and permitted demands police officers may make, out of concern for officer safety and without independent justification, during the course of a lawful traffic stop. Appellant forwards no claim that Officer Henry lacked authority to ask for identification, to inquire about the presence of weapons, to request that Appellant exit the vehicle, or to demand that Appellant surrender his firearm for the duration of the stop. ***See*** Appellant's Brief at 15. Moreover, our reading of the transcript reveals that Officer Henry secured Appellant's firearm without incident before requesting that Appellant produce documentation that the firearm was lawfully in his possession. Officer Henry's seizure of the firearm essentially eliminated any immediate risk the weapon posed to law enforcement personnel, bystanders, and occupants of the vehicle for the duration of the stop and transformed the officer's pursuit of Appellant's firearms credentials into an inquiry exclusively

- 17 -

aimed at collecting evidence of collateral wrongdoing. **See Rodriguez**, 575 U.S. at 355. Put differently, once Officer Henry secured the firearm, Appellant's legal authority to own or possess a gun clearly bore no discernible relationship to individual safety or security within the context of the traffic stop. Under these circumstances, where seizure of a firearm has substantially diminished the risk to officers and others who may be present during a lawful vehicle detention, we see no reason why the Fourth Amendment, in the absence of independent justification, suspicion, or cause, should tolerate even a 10- to 15-minute extension of a routine traffic stop for the investigation of a secondary criminal matter. Hence, the request challenged in this case does not fall within the category of actions the police may undertake during a lawful traffic stop based solely on concerns for safety and security and without independent justification or cause.

We have rejected Officer Henry's investigation into Appellant's authority to carry a firearm as an inquiry incidental to the traffic stop and we have excluded his efforts as a permissible precaution the police may take during a lawful traffic stop without independent cause. Despite these determinations, the trial court nonetheless concludes that suppression should be denied because Officer Henry possessed reasonable suspicion to conduct an investigative detention. **See** Trial Court Opinion, 6/8/20, at 8. In reaching this conclusion, the trial court rejects Appellant's claim that Officer Henry lacked reasonable suspicion to investigate Appellant's possession of a firearm

in light of our Supreme Court's recent holding in *Commonwealth v. Hicks*, 208 A.3d 916 (Pa. 2019).

*Hicks* overruled a prior decision of this Court which held that the "possession of a concealed firearm by an individual in public is sufficient [in and of itself] to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed [to carry a firearm]." *Hicks*, 208 A.3d at 921, *quoting Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. 1991). The trial court argues that *Hicks* is distinguishable for two reasons. First, the court points out that Officer Henry "was already in the midst of conducting a lawful stop during the time he engaged with [Appellant]." Trial Court Opinion, 6/8/20, at 8. Next, the court notes that Officer Henry's investigation was not based solely upon Appellant's possession of a firearm but, instead, commenced after Appellant produced an expired Act 235 card. *Id.* at 7-8. The trial court reasons that, in view of these circumstances, Officer Henry had reasonable suspicion to investigate whether Appellant lawfully possessed a firearm. Because we determine that *Hicks* applies and that the trial court's determinations do not withstand scrutiny, we conclude that the trial court erred in denying suppression.

*Hicks* offers the following general principles of search and seizure law which govern our review.

> [Pennsylvania courts] recognize only two types of lawful, warrantless seizures of the person, both of which "require an

- 19 -

appropriate showing of antecedent justification: first, an arrest based upon probable cause; second, a 'stop and frisk' based upon reasonable suspicion." ***Commonwealth v. Melendez***, 676 A.2d 226, 228 (Pa. 1996), *quoting* ***Commonwealth v. Rodriquez***, 614 A.2d 1378, 1382 (Pa. 1992). Here, we are concerned with this latter type of seizure—interchangeably labeled an "investigative detention," a "***Terry***[7] stop," or, when coupled with a brief pat-down search for weapons on the suspect's person, a "stop and frisk."

"To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion." ***Commonwealth v. Strickler***, 757 A.2d 884, 889 (Pa. 2000). The asserted grounds for an investigative detention must be evaluated under the totality of the circumstances. ***See United States v. Cortez***, 449 U.S. 411, 417-418 (1981). So long as the initial detention is lawful, nothing precludes a police officer from acting upon the fortuitous discovery of evidence suggesting a different crime than that initially suspected[.] However, an unjustified seizure immediately violates the Fourth Amendment rights of the suspect, taints the evidence recovered thereby, and subjects that evidence to the exclusionary rule. ***See***, ***e.g.***, ***Melendez***, 676 A.2d at 229-230.

***Commonwealth v. Hicks***, 208 A.3d 916, 927-928 (Pa. 2019) (parallel citations omitted).

In this case, Officer Henry lawfully stopped the vehicle occupied by Appellant as a passenger after observing that the vehicle's license plate was not properly displayed. Upon learning that Appellant possessed a firearm,

---

[7] ***Terry v. Ohio***, 392 U.S. 1 (1968).

Officer Henry asked Appellant to exit the vehicle and to surrender his weapon.[8] Appellant complied without incident. Immediately after securing Appellant's firearm, Officer Henry asked Appellant to produce documentation confirming his legal right to carry a gun. Before issuing this request, Officer Henry possessed no evidence showing that Appellant was involved in criminal activity, that Appellant had engaged in furtive movements, that recent gun-related criminal activity had occurred in the vicinity of the stop, or that criminal activity (apart from an improperly displayed license plate) had taken place in the vehicle in which Appellant was traveling as a passenger. In addition, neither the trial court nor the Commonwealth points to evidence linking Appellant to criminal activity or furtive movements prior to Officer Henry's request that Appellant produce documentary proof that he was authorized to carry a firearm. In short, Appellant's possession of a firearm was the only fact offered by the Commonwealth to support the investigative detention that occurred when Officer Henry restrained Appellant's movement to pursue an investigation of Appellant's legal authority to carry a firearm.

In **Hicks**, our Supreme Court held that mere possession of a firearm did not establish reasonable suspicion to allow an officer to approach and detain an individual in order to investigate whether he or she was properly licensed

---

[8] As we explained above, Appellant raises no challenge to these actions by Officer Henry as they are permitted, without independent justification, within the context of a lawful traffic stop to preserve the safety of officers, bystanders, and vehicle occupants.

to carry a firearm in public. *See Hicks, supra*. In the view of the *Hicks* Court, a contrary position contravenes the requirements set forth in *Terry* and subverts the protections of the Fourth Amendment. Thus, under *Hicks*, we are constrained to conclude that the Commonwealth did not come forward with reasonable suspicion to support the investigative detention in this case.

The trial court argues that *Hicks* is distinguishable, and that Officer Henry could treat Appellant's possession of a firearm as *per se* authorization to pursue an investigation, because the officer already had commenced a lawful stop. *See* Trial Court Opinion, 6/8/20, at 8. Assuming the trial court refers here to the traffic stop, this view is mistaken. Although Officer Henry's observations established probable cause to support the traffic stop, they did not link Appellant to criminal activity and, more importantly, they did not set in motion the investigative detention challenged herein. Officer Henry did not investigate Appellant's firearms licensure status because he was a passenger in a lawfully stopped vehicle; instead, Officer Henry commenced the challenged detention and investigation when he learned that Appellant was carrying a firearm. Contrary to the trial court's conclusion that Officer Henry was "in the midst of" a lawful investigative detention when he asked for Appellant's firearms credentials, Appellant's removal from the vehicle, as we explained above, was not "investigative" in nature but permitted, without cause, as a precautionary measure to ensure safety during a valid vehicle stop. Hence, the relevant, antecedent **investigative** detention of Appellant

(and the one challenged in the context of this appeal) is the detention which commenced when Officer Henry restrained Appellant's liberty to ascertain his authority to carry a firearm.[9] This conclusion aligns with the rationale advanced in *Hicks*, which deemed any encounter undertaken to investigate an individual's firearms licensure status as a request for information that a citizen cannot ignore and, as such, an investigative detention governed by the Fourth Amendment. *See Hicks*, 208 A.3d at 927-928.

Finally, we reject the trial court's conclusion that reasonable suspicion supported the challenged investigative detention because Officer Henry commenced his inquiry based upon Appellant's possession of a firearm and Appellant's expired Act 235 card. The record squarely refutes this conclusion. Officer Henry commenced an investigative detention when he asked for documentation establishing Appellant's right to carry a firearm. At that time, the only information within Officer Henry's possession was that Appellant had a firearm holstered on his right hip. Under *Hicks*, that information was insufficient as a matter of law to establish reasonable suspicion. Moreover, Officer Henry's receipt of the expired Act 235 card after the start of the detention cannot be used to justify the seizure. *See Commonwealth v.*

---

[9] Were we to adopt the trial court's view and permit a lawful traffic stop to serve as the relevant antecedent investigative detention, we would essentially resurrect the *Robinson* rule within the context of constitutionally justified traffic stops. We do not read *Hicks* as allowing courts to treat the justification for a traffic stop as grounds for permitting licensure checks for motorists and passengers who merely possess a concealed firearm.

***Mackey***, 177 A.3d 221, 228 (Pa. Super. 2017) (police must have reasonable suspicion at the moment of detention; information developed after a police-citizen encounter moves from consensual to coercive cannot be used to justify the detention). Because Officer Henry lacked reasonable suspicion to detain Appellant and investigate his legal authority to carry a firearm, the detention challenged on appeal violated Appellant's Fourth Amendment rights and all evidence seized as a result of the investigation is subject to exclusion at trial. ***See Hicks, supra***.

For each of the reasons set forth above, Appellant is entitled to suppression of the firearm and his statements to law enforcement personnel. Accordingly, we vacate the trial court's order denying suppression and remand this matter for further proceedings.

Order denying suppression vacated. Case remanded. Jurisdiction relinquished.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/19/21