J-S04001-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KUO DONG | : | |
| | : | |
| Appellant | : | No. 1649 EDA 2025 |

Appeal from the Judgment of Sentence Entered May 21, 2025
In the Court of Common Pleas of Northampton County Criminal Division
at No(s):  CP-48-CR-0003222-2023

BEFORE:  LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY LAZARUS, P.J.:            **FILED FEBRUARY 9, 2026**

Kuo Dong appeals from the judgment of sentence, entered in the Court of Common Pleas of Northampton County, following his convictions for multiple drug charges and summary traffic offenses.  On appeal, Dong challenges the trial court's denial of his motion to suppress statements made during a traffic stop and physical evidence uncovered from a search of his vehicle.  After careful review, we affirm.

On the evening of June 19, 2023, Pennsylvania State Trooper Antonio Stauffer, a six-year veteran of the force at the time, was monitoring westbound traffic on Interstate 78 from his marked patrol vehicle parked on the side of the highway.  *See* N.T. Suppression Hearing, 3/6/25, at 4-8.  Trooper Stauffer was working with the Borough of Criminal Investigation Drug Law Enforcement Division, focusing on financial investigations and asset forfeitures.  *Id.* at 5.  At 7:59 P.M., Trooper Stauffer observed Dong's black

Toyota Camry approach his vehicle and slow down considerably. Trooper Stauffer testified that he saw Dong "beg[in] to lean behind the B-pillar," pass his squad car, and then immediately move from the right lane into the middle lane where he followed a tractor-trailer too closely.[1] *Id.* at 9. At that time, Trooper Stauffer pulled out from the side of the highway and began to follow and monitor the speed of Dong's vehicle for .3 miles. *Id.* at 10-11. The trooper clocked Dong traveling 75 miles per hour (MPH) in a 65 MPH speed zone. *Id.* at 11. At that point, Trooper Stauffer activated the overhead lights on his patrol car and initiated a stop of Dong's vehicle on the right shoulder of the roadway in Lower Saucon Township. *Id.* at 12.

Trooper Stauffer approached the passenger side of Dong's vehicle, noting that Dong was the only occupant of the car. *Id.* at 13. Trooper Stauffer testified that "the moment [he] got to the passenger[-]side window[,]" he smelled an odor of raw marijuana.[2] *Id.* at 14. The trooper asked Dong for his license, registration, and proof of insurance. *Id.* Dong provided Trooper Stauffer with a New York driver's license and the car's registration but was not able to provide proof of insurance. *Id.* at 13-14. Trooper Stauffer testified that Dong was "very nervous[,] . . . ha[d] trouble find[ing] his documents[, and he could] see his hands shaking." *Id.* at 14.

_____

[1] The "B-pillar is a structural component in vehicles that . . . is located between the front and rear doors[.]" *See* www.leanmanufacture.net/articles/pillars-of-lean/ (last visited 1/28/26).

[2] Although Trooper Stauffer testified he did not ask Dong if he had a medical marijuana card, Dong did not provide one to explain the odor in the vehicle.

Once Dong provided Trooper Stauffer with his license and registration, the trooper requested Dong exit his vehicle and stand by the patrol vehicle's passenger-side window while the trooper ran Dong's license, vehicle registration, and background history through the police data base. *Id.* at 15-16. As he checked Dong's information, Trooper Stauffer asked Dong "where he was traveling to[ and w]ho he was going to see." *Id.* Dong told the trooper that he was coming from his house in NY, was heading to Allentown to meet a friend for dinner, and then was going to "turn right back around and go [back] to New York." *Id.* at 18.

At that point, eight minutes into the traffic stop, Trooper Stauffer asked Dong if there were any illegal drugs in the vehicle and for consent to search the car, which Dong refused.[3] *Id.* at 19-21. Trooper Stauffer then called for a K-9 interdiction dog from Lower Bucks County, which ultimately made a "hit on [] Dong's vehicle" for drugs.[4] *Id.* at 24. The trooper then handcuffed Dong, placed him in his cruiser, and transported him to the state police barracks. *Id.* at 28. Trooper Stauffer called for a tow truck to have Dong's vehicle towed back to the Belfast Police Barracks where a search warrant was

_____

[3] Trooper Stauffer testified that once he asked for Dong's consent to search his vehicle, Dong appeared to not understand the trooper's questions due to a language barrier. At that moment, the trooper began using Google Translate to speak to Dong and Dong indicated he understood the trooper's questions. *See id.* at 20-21. Dong does not raise any issue regarding his failure to understand the trooper during the stop.

[4] The trooper estimated it took roughly one hour for the K-9 unit to show up on the scene. *Id.* at 22.

- 3 -

ultimately obtained for the Toyota. *Id.* at 25. A search of Dong's vehicle uncovered: four small clear vacuum-sealed bags, containing suspected marijuana; four large clear vacuum sealed bags, containing suspected marijuana; a large green Ziploc bag; a large light green supermarket bag; an ornament of a dog posed with a marijuana cigarette in its mouth; a light blue Apple iPhone with a gold case; a scented large trash bag; four Bank of America debit cards, all with different card numbers; and the vehicle title for the Toyota Camry. *Id.* at 26. The Bethlehem Regional Laboratory tested the substances inside the bags and issued a report stating the stash contained "approximately four one-pound packets containing marijuana." *Id.* at 28.

Dong was charged with one count each of possession of a controlled substance with the intent to deliver,[5] possession of a controlled substance,[6] possession of drug paraphernalia,[7] and three summary motor vehicle code (MVC) violations.[8] Dong filed a pre-trial motion to suppress all physical evidence seized from his vehicle and all statements he made to law enforcement. Following a hearing, the court denied the motion. Following trial, Dong was found guilty of all charges and sentenced to four years of

---

[5] 35 P.S. § 780-113(a)(30).

[6] *Id.* at § 780-113(a)(16).

[7] *Id.* at § 780-113(a)(32).

[8] 75 Pa.C.S.A. § 3362(a)(1.1) (traveling between 60-70 MPH and exceeding speed limit by 10 MPH); *id.* at § 1786(f) (operating vehicle without required financial responsibility), and *id.* § 3310(a) (following too closely).

probation, plus fines and costs. Dong filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He presents the following issue for our consideration: "Whether the trial court committed reversible error by denying [] Dong's suppression motion, where he was unlawfully seized when a state trooper diverted from the traffic stop's infraction-and-safety-based mission to investigate other criminal conduct, and meaningfully prolonged the stop." Appellant's Brief, at 3.

> [An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

***Commonwealth v. Smith***, 164 A.3d 1255, 1257 (Pa. Super. 2017) (citation omitted). Additionally, the Pennsylvania Supreme Court has ruled that when reviewing a motion to suppress, we may not look beyond the suppression record. ***Id.*** (citation omitted).

Dong claims that Trooper Stauffer "improperly extended the traffic stop" by asking questions that were neither related to the initial reason for the stop nor supported by independent reasonable suspicion. **See** Appellant's Brief, at 8. Specifically, Dong maintains that the legitimate traffic stop became unlawful because it was prolonged beyond the time reasonably required to complete the stop's mission.

It is well-established that an officer may conduct a legitimate traffic stop when he has witnessed any technical violation of the traffic code. **See Commonwealth v. Harris**, 176 A.3d 1009, 1020 (Pa. Super. 2019). Moreover, "where the purpose of an initial traffic stop has ended[] and a reasonable person would not have believed that he was free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest" that requires reasonable suspicion or probable cause, respectively. **Commonwealth v. Freeman**, 757 A.2d 903, 907 (Pa. 2000). In **Commonwealth v. Malloy**, 257 A.3d 142 (Pa. Super. 2021), our Court reiterated the law regarding the lawful duration for traffic stops:

> [T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop [] and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been[—]completed.
>
> [A] traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a

- 6 -

warning ticket. . . . An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop. Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Id.* at 149-50, citing *Rodriguez v. United States*, 575 U.S. 348 (2015) (citations omitted) (quotation marks omitted).

In addition to asking "mission related" questions during a lawful traffic stop, an officer may also make incidental inquiries to ensure the safety and responsible operations of vehicles on our Commonwealth's highways. *Malloy*, *supra* at 150 (citation omitted). To ensure officer safety, law enforcement may inquire about the presence of weapons and compel occupants to exit a lawfully stopped vehicle. *Id.* "The authority to carry out these actions do[es] not, in and of [it]sel[f], expand the grounds for detaining or investigating passengers who are merely present in a lawfully stopped vehicle." *Id.*

Here, Trooper Stauffer testified that he stopped Dong after observing him change lanes quickly, follow a tractor trailer too closely, and, after following Dong for one third of a mile, clocking the vehicle traveling at approximately 75 miles per hour in a 65 miles per hour speed zone. *See* N.T. Suppression Hearing, 3/6/25, at 9, 12. *See Commonwealth v. Freeman*, 150 A.3d 32 (Pa. Super. 2016) (trooper possessed probable cause to initiate

vehicle stop based on defendant violating MVC by making several unsafe lane changes and driving too close to tractor trailer). After approaching Dong's car from the passenger side,[9] Trooper Stauffer asked Dong for his license, registration, and proof of insurance. *Id.* at 13. Dong proceeded to produce a New York driver's license and a registration card, but was unable to provide proof of insurance. *Id.* at 13-14.

Trooper Stauffer observed Dong acting nervous, saw his hands shaking, and smelled the odor of raw marijuana emanating from Dong's vehicle "the moment [he] got to the passenger side window." *Id.* at 14; *see also id.* (Trooper Stauffer testifying Dong seemed nervous and had difficulty trying to find requested documents). Once Dong provided the registration and license to Trooper Stauffer, the trooper asked Dong to exit the vehicle and stand by the passenger side window of the trooper's vehicle while he checked his documents.[10] *Id.* at 15.

While Dong waited for the trooper to check his information in the police data base, Trooper Stauffer asked him questions about his travel plans. In response, Dong told the trooper that he was traveling to Allentown (a known high-crime area and narcotics distribution center) from his home in Flushing, New York (big marijuana hub). *Id.* at 16, 19. As Trooper Stauffer continued

---

[9] Trooper Stauffer testified that it has been proven to be statistically safer to make contact with the driver of a stopped vehicle from the passenger's side rather than the driver's side. *See id.* at 13.

[10] Trooper Stauffer acknowledged that Dong was not free to leave at this point in the encounter. *Id.* at 17.

to ask Dong questions about his intended journey, Dong "gave conflicting stories[,] originally stat[ing] that he was going to see one friend [and t]hen stat[ing] that he was going to see another [friend with a] different name." *Id.* at 17; *see also id.* at 18 (trooper testifying "several times during traffic encounter," Dong completely changed story about where he was going to eat with friend in Allentown). In addition, Dong told Trooper Stauffer that he was planning on meeting his friend, eating with him, and then "turn[ing] right back around and [returning] to New York"—a major indicator of criminal activity according to Trooper Stauffer. *Id.* at 18. *See Barr*, *supra* (officer may consider odor of raw marijuana, in addition to other factors, in determining if reasonable suspicion exists for investigative detention); *but cf. Commonwealth v. Mattis*, 252 A.3d 650, 655 (Pa. Super. 2021) (nervous behavior, alone, did not provide sufficient basis to warrant investigatory detention when officer stopped defendant for speeding).

Trooper Stauffer testified that after seeing Dong exhibit nervous behavior and give several inconsistent answers to his questions—approximately 8 minutes from the beginning of the stop—he asked Dong for consent to search the vehicle for illegal drugs. Trooper Stauffer testified that he had a reasonable suspicion that Dong was involved in transporting narcotics. *Id.* at 19; *see also id.* (Trooper Stauffer testifying as to "the number of indicators" tipping him off that Dong may be involved in trafficking drugs); *id.* at 27 (Trooper Stauffer testifying bags are vacuum-sealed to mask any odor of drugs inside. Dong refused to consent to the search of his vehicle.

- 9 -

*Id.* at 21.  At that moment, which was approximately 10-12 minutes from the initiation of the stop, Trooper Stauffer called the state police to bring a K-9 interdiction dog to the stop.  *Id.*

Based upon the totality of the circumstances, we conclude that Trooper Stauffer had, at a minimum, reasonable suspicion to conduct a second investigation based on information gathered during the initial traffic stop. Trooper Stauffer, a seven-year veteran of the Pennsylvania State Police's Drug Law Enforcement Division, testified that:  Allentown was a "source city" known be a high-crime area and distribution center for narcotics; a "quick turnaround trip" is a major indicator of criminal activity; and Flushing, New York is "probably the biggest hub of marijuana."  *Commonwealth v. Young*, 904 A.2d 947, 957 (Pa. Super. 2006) ("In making this determination [as to whether reasonable suspicion existed], we must give due weight . . . to the specific reasonable inferences [the officer] is entitled to draw from the facts in light of his experience.").  The trooper's continued detention of Dong was not unlawful where Trooper Stauffer testified he immediately smelled raw marijuana emanating from Dong's vehicle upon his initial approach, Dong appeared nervous and had shaky hands, and Dong gave several inconsistent answers to the trooper's pointed questions about where he was going, who he was going to visit, and from where he was coming.  *Barr*, *supra*.

Thus, we agree with the trial court that the trooper had reasonable suspicion to conduct an investigatory detention and to prolong the initial traffic stop beyond the primary purpose of the initial stop for a speeding violation.

- 10 -

Because the suppression court properly applied the law to the facts and the record supports the trial court's factual findings, the court properly denied Dong's motion to suppress. **Smith**, **supra**.

Judgment of sentence affirmed.[11]

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/9/2026

---

[11] Dong repeatedly classifies Trooper Stauffer's questions, while he ran his documents thorough the police data base, as "off-mission." However, Dong acknowledges that "the trooper was entitled to inquire about [his] travel plans." Appellant's Brief, at 15. Moreover, Trooper Stauffer testified that at the time he asked Dong what his plans were, the trooper suspected that Dong may be trafficking drugs based upon where he was going, how quickly he was returning to NY, his nervous behavior, the smell of raw marijuana, and inconsistent answers. **See Commonwealth v. Galloway**, 265 A.3d 810, 817 (Pa. Super. 2021) (once trooper accomplished initial mission of traffic stop, trooper properly extended traffic stop by "ask[ing] additional questions of [defendant] on account of reasonable suspicion '[t]hat there's probably some type of criminal activity going on'").