J-S27022-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANGEL RIVERA | : | No. 218 EDA 2022 |

Appeal from the Order Entered December 10, 2021
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0001363-2021

BEFORE:  STABILE, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED NOVEMBER 28, 2022**

The Commonwealth appeals from the order granting Appellee Angel Rivera's motion to suppress statements Appellee made and evidence seized following a traffic stop.[1] The Commonwealth contends that the trial court abused its discretion or committed an error of law in granting Appellee's suppression motion.  After careful review, we reverse and remand for further proceedings.

The record reflects that on September 12, 2020, at 1:41 p.m., Trooper Henry Kim of the Pennsylvania State Police was on patrol on Interstate 95 in

---

[1] In its notice of appeal, the Commonwealth certified that the trial court's suppression order would terminate or substantially handicap the prosecution of its case.  **See** Pa.R.A.P. 311(d) (stating that "in a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution").  Notice of Appeal, 1/6/22; **see also** Commonwealth's Brief at 1.

Delaware County. N.T., 10/22/21, at 11. Trooper Kim testified that he observed a tan sedan travelling faster than surrounding vehicles and following too closely behind the vehicle ahead of it. The trooper followed the tan vehicle and witnessed it cross the center line of the highway. Trooper Kim activated his emergency lights and sirens and directed the driver of the tan vehicle to pull over. When the vehicle pulled to the side of the highway, Trooper Kim noted that the two occupants of the car were acting suspiciously and moving back and forth in their seats, and he saw the driver extended his arm toward the passenger. *Id.* at 11-15. The trooper exited his patrol car and approached the tan vehicle. *Id.* at 17-19. The trooper asked the driver for his license, insurance, and registration. *Id.* at 50. The driver indicated that the vehicle belonged to his wife. *Id.* at 23. When the trooper reached the vehicle he testified that the driver's eyes looked "pinpoint," and his experience led him to conclude that this was an indication of drug intoxication, possibly opioids. *Id.* at 19-20. The trooper testified that at this point, the motor vehicle stop shifted to a possible instance of driving under the influence. *Id.* at 20. Trooper Kim stated that the driver's behavior appeared nervous, shaky, and erratic, and therefore, the trooper asked the driver to exit the vehicle. *Id.* at 21-22. The trooper informed the driver that for his safety he was going to conduct a pat-down. *Id.* 28. The driver turned his pockets inside-out revealing that he had nothing in his pockets, and Trooper Kim testified that this alleviated his concern that the driver may have possessed a weapon or hypodermic needle. *Id.* at 28-29. The trooper asked the driver where he was

coming from, and the driver said that he had driven to Philadelphia to drop off a job application, and he and the passenger, later identified as Appellee, were returning to Delaware. *Id.* at 22. The trooper asked the driver how long he had known Appellee, and the driver indicated that he had known Appellee for approximately one year. *Id.* at 23. Trooper Kim asked the driver for consent to search the vehicle, and the driver consented. *Id.* at 24. At this point, the trooper asked Appellee questions similar to those he asked the driver. The trooper asked where they were coming from, and how long Appellee had known the driver. Like the driver, Appellee responded that they had driven to Philadelphia to drop off a job application and were returning to Delaware. *Id.* at 28-29. However, when asked how long he had known the driver, Appellee told the trooper three to four years or several years, and this conflicted with the driver's answer of one year. *Id.* at 29.

The trooper testified that the driver and Appellee's movements and behavior, and their possible deceit, led him to become more suspicious that a crime was occurring. The trooper informed Appellee that the driver had given consent to search and told Appellee that he was not under arrest but asked him to exit the car. *Id.* at 32. The trooper reiterated to Appellee that he was not under arrest, but the trooper was going to conduct a pat down for the trooper's safety. *Id.* at 35. Appellee raised his hands and said that he did not want a pat-down and reached toward his left pants pocket. *Id.* at 35-36. The trooper asked why Appellee was worried, and Appellee said that he was going to a shooting range. *Id.* at 37. This led the trooper to conclude that

Appellee had a firearm, and Appellee then told the trooper the gun was in Appellee's right pants cargo pocket. *Id.* at 38, 64. The trooper told Appellee to stop reaching for the gun, and the trooper seized the firearm. *Id.* at 39. Appellee had a magazine for the gun in his left pocket and volunteered that he had a pack of cigarettes in his pocket that contained narcotics. *Id.* at 39, 64. When the trooper asked Appellee if he had a permit, Appellee responded that he did not. *Id.* 38-39. Trooper Kim testified that his partner, Trooper Solis, arrived to provide assistance. *Id.* at 40. Trooper Kim testified that the first time that he had physical contact with Appellee was when the trooper seized the firearm. *Id.* at 41.[2] After securing the gun, the trooper searched the vehicle and found what appeared to him to be an empty packet of heroin, and he testified that he then administered field sobriety tests to the driver.[3] *Id.* at 49. The trooper testified that despite the warning, he never patted down either driver or Appellee. *Id.* at 47.[4]

_____

[2] The Commonwealth played the video, which was recorded by the camera in the police vehicle. This video showed the trooper's pursuit of the vehicle and interaction with Appellee. N.T., 10/22/21, at 41-42. The video was marked as Commonwealth Exhibit CS-1 and admitted into evidence without objection. *Id.* at 41, 45.

[3] The driver, David Rodriguez-Ramos, was charged with driving under the influence of a controlled substance and was accepted into ARD at trial court docket CP-23-CR-1364-2021.

[4] "So, ironically, I actually never ended up patting down anybody." N.T., 10/22/21, at 47.

The Commonwealth charged Appellee with possession of a controlled substance (PWID), possession of drug paraphernalia, firearms not to be carried without a license, and possession of a firearm by a prohibited person.[5] Appellee filed a motion to suppress claiming that Appellee was subjected to a rigorous pat down, numerous inquiries, and a prolonged search. Appellee alleged that although he told the trooper he did not want a pat-down, the trooper said it was for officer safety. Appellant averred the search went beyond what was necessary for the traffic stop, the police lacked reasonable suspicion to support the conclusion that Appellee was engaged in criminal activity or that he or that he was armed and dangerous. Suppression Mot., 7/6/21, at 1-2.

On October 26, 2021, the trial court granted Appellee's motion to suppress. The Commonwealth filed a motion for reconsideration, and the trial court held a hearing on the Commonwealth's motion.

The trial court concluded that the traffic stop was justified because the vehicle was traveling at a speed in excess of the posted limit. Am. Trial Ct. Op. 1/21/22, at 1. However, the court determined that the prolonged detention that followed the traffic stop was not justified under the circumstances because the trooper had uncovered all information necessary to determine whether to issue a warning or a citation to the driver. *Id.* The trial court found that the trooper had completed the necessary investigation

---

[5] 35 P.S. § 780-113(a)(16) and (32), and 18 Pa.C.S. §§ 6106(a)(2) and 6105(a)(1).

prior to speaking to Appellee. *Id.* at 2-3. Therefore, the trial court reaffirmed its prior order granting Appellee's motion to suppress. *Id.* at 3-6.

The Commonwealth filed this timely appeal. Both the Commonwealth and the trial court complied with Pa.R.A.P. 1925.

On appeal, the Commonwealth raises the follow issues:

1. Did the trial court err by suppressing the statement made by Appellee where Appellee was not in custody, but merely detained as a result of a vehicle stop?

2. Did the trial court err by suppressing evidence of a loaded gun, ammunition, illegal drugs and drug paraphernalia recovered by the police from Appellee's person after the State Trooper made a lawful car stop in which Appellee was the passenger, and the trooper had reasonable suspicion to frisk [Appellee] as a result of Appellee's statement regarding possessing an unlicensed gun in his pocket?

Commonwealth's Brief at 5 (formatting altered).[6] Because the Commonwealth's issues are interrelated, we address them together.

The Commonwealth contends that Trooper Kim had probable cause to stop the vehicle for violating the Motor Vehicle Code. Commonwealth's Brief

---

[6] We note that Appellee asserts that the Commonwealth waived its issues on appeal for failing to present them in its Rule 1925(b) statement. Appellee's Brief at 10. We note that the Rule requires that the statement must "concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge." Pa.R.A.P. 1925(b)(4)(ii). We conclude that the Commonwealth's Rule 1925(b) statement sufficiently identified errors concerning the validity of the traffic stop, the suppression of Appellees' statements to police, and the legality of the subsequent search. Accordingly, we decline to find waiver. *See, e.g., Commonwealth v. McKown*, 79 A.3d 678, 685 n.5 (Pa. Super. 2013) (declining to find waiver where an issue on appeal is fairly included within an issue presented in the Rule 1925(b) statement).

at 19. Further, during this traffic stop, Trooper Kim was permitted to direct the occupants of the vehicle to exit the car. *Id.* at 20. Upon approaching the vehicle, Trooper Kim noticed that driver was nervous and possibly intoxicated. *Id.* at 20-21. The Commonwealth argues that the trial court failed to recognize that Trooper Kim's inquiries into the suspected Motor Vehicle Code violations were not at an end after he spoke to the driver, because Trooper Kim suspected the driver was driving while under the influence which required additional investigation. *Id.* at 25. After the occupants were lawfully directed to exit the car, the Commonwealth notes that Trooper Kim was permitted to conduct a search of the occupants, even absent reasonable suspicion, for officer safety. *Id.* at 20-21. When Trooper Kim informed Appellee that he was going to search him for weapons for his own safety, Appellee volunteered that he possessed a firearm, and no *Miranda*[7] warnings were required because Appellee was not subject to a custodial interrogation. *Id.* at 28. The evidence seized following the search was incident to a lawful arrest. *Id.* at 29-30.

When reviewing a challenge to a suppression ruling, our standard of review is

> limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the [defense] prevailed before the suppression court, we may consider only the evidence of the [defense] and so much of the evidence for the [Commonwealth] as remains uncontradicted

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (U.S. 1966).

when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

**Commonwealth v. Smith**, 164 A.3d 1255, 1257 (Pa. Super. 2017) (citation omitted and formatting altered).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect citizens from unreasonable searches and seizures. A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies.

**Commonwealth v. Simonson**, 148 A.3d 792, 797 (Pa. Super. 2016) (citations omitted and formatting altered).

In **Commonwealth v. Malloy**, 257 A.3d 142 (Pa. Super. 2021), this Court explained:

In light of the Pennsylvania Supreme Court's interpretation of the current language of [75 Pa.C.S. §] 6308(b), we are compelled to conclude that the standards concerning the quantum of cause necessary for an officer to stop a vehicle in this Commonwealth are settled. Traffic stops based on a reasonable suspicion: either of criminal activity or a violation of the Motor Vehicle Code under the authority of Section 6308(b) must serve a stated investigatory purpose. **See Commonwealth v. Chase**, 960 A.2d 108, 116 (Pa. 2008). In effect, the language of Section 6308(b)—"to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title"—is conceptually equivalent with the underlying purpose of a stop conducted

pursuant to **Terry v. Ohio**, 392 U.S. 1 (1968). **See Chase**, 960 A.2d at 116 (quoting 75 Pa.C.S. § 6308(b)).

Mere reasonable suspicion will not justify a vehicle stop when the driver's detention cannot serve an investigatory purpose relevant to the suspected violation. In such an instance, "it is incumbent upon the officer to articulate specific facts possessed by him, at the time of the questioned stop, which would provide probable cause to believe that the vehicle or the driver was in violation of some provision of the Motor Vehicle Code." **Commonwealth v. Gleason**, 785 A.2d 983, 989 (Pa. 2001) (superseded by statute) (citation omitted); **see also Chase**, 960 A.2d at 116 (reaffirming **Gleason's** probable cause standard for non-investigative detentions of suspected Vehicle Code violations.

**Id.** at 148 (quoting **Commonwealth v. Feczko**, 10 A.3d 1285, 1290-91 (Pa.

Super. 2010) (*en banc*)) (formatting altered).

Out of concern for officer safety, Pennsylvania search and seizure jurisprudence also permits certain limited intrusions upon the liberty of passengers in lawfully detained vehicles. Hence, officers may order passengers to remain in a car for the duration of a lawful stop. Law enforcement officials may also inquire about the presence of weapons. Lastly, police officials may compel passengers to exit a lawfully stopped vehicle. The authority to carry out these actions do not, in and of themselves, expand the grounds for detaining or investigating passengers who are merely present in a lawfully stopped vehicle.

**Id.** at 150 (citations omitted and formatting altered).

The tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.

A traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket. . . . An officer, in other words, may conduct certain

unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Id.* at 149-50 (quoting ***Rodriguez v. United States***, 575 U.S. 348, 354 (2015)) (citations omitted and some formatting altered). Accordingly, "within the context of a lawful traffic stop, ***Rodriguez*** permits 'mission related' inquiries addressed to the traffic violations which originally prompted the detention, as well as incidental inquiries aimed at ensuring the safe and responsible operation of vehicles on the highway." *Id.* at 150. Additionally, we note that "furtive movements, when witnessed within the scope of a lawful traffic stop, [may] provide . . . a reasonable basis for a protective frisk." ***Commonwealth v. Simmons***, 17 A.3d 399, 403-04 (Pa. Super. 2011).

In its opinion, the trial court concluded that the traffic stop was justified because the vehicle was traveling at a speed in excess of the posted limit. Am. Trial Ct. Op. 1/21/22, at 1. However, the trial court concluded that Trooper Kim initiated the traffic stop only because the vehicle was exceeding the posted speed limit. *Id.* at 2. The court found that the prolonged detention that followed the traffic stop was not justified under the circumstances because the trooper had uncovered all information necessary to determine

whether to issue a warning or a citation to the driver. ***Id.*** The trial court concluded that Trooper Kim initiated a traffic stop and addressed the driver, and "the driver, once addressed, provided the requisite information to the police. This offered a reasonable opportunity for the police to issue a traffic citation and allow the vehicle occupants to continue on their way." ***Id.*** The trial court found that the credible evidence including the police vehicle's dash-cam recording reflects that the troopers offered a pretext for an exploratory search: "[T]he Trooper's testimony concerning what occurred after the initial purpose for the stop was accomplished seemed less certain and candid when compared with his demeanor when testifying concerning his interaction with the driver." ***Id.*** at 3. The trial court concluded that "the insecurity" of the trooper's testimony combined with the lack of credible facts "suggest nothing untoward to support the efforts of the police in continuing the investigation after the original purpose of the traffic stop was completed." ***Id.*** The trial court acknowledged that although the police were permitted to ask the occupants to exit the vehicle, the police did not offer credible evidence of an independent cause to support the need for further investigation. ***Id.*** Accordingly, the court found that the trooper had completed the necessary investigation prior to initiating an interaction with Appellee. ***Id.*** at 2-3. The trial court asserts that although the Trooper was permitted to legally ask the occupants of the car to exit, the Trooper did not provide credible evidence of an independent reason for further investigation "particularly related to the

presence of [Appellant's] legal (or even any) possession of a firearm." ***Id.*** at 2-3. The trial court cites ***Malloy*** as support for its conclusion. ***Id.*** at 3.

After review, we are constrained to disagree with the trial court's findings and conclusions as they are not supported by the record. ***See Smith***, 164 A.3d at 1257. In ***Malloy***, police initiated a traffic stop because the vehicle in question did not have a license plate properly displayed, which constituted a violation of the Motor Vehicle Code. ***Malloy***, 257 A.3d at 145 (citing 75 Pa.C.S. § 1332 (display of registration plate)). However, when the officer approached the driver, he saw "a license tag" in the rear windshield. The officer also observed several occupants inside the car, including the appellant, who was seated in the rear behind the driver. The officer told the driver that that the car did not have a license plate on the back, and the driver informed the officer that he had recently obtained the car and needed to get screws to secure the license plate. The officer then continued his investigation and asked the appellant to roll down his window. The officer asked the appellant for identification, and the appellant removed a lanyard from inside his hooded sweatshirt. The officer believed that some individuals who work as armed security guards at local bars wear lanyards holding their identification, and the officer asked if Appellant was carrying a firearm. The appellant responded that he did have a firearm, and the officer asked where this firearm was located. The appellant responded that the firearm was on his right hip. It was at this point that the officer asked the appellant to exit the vehicle so that

he could secure the firearm before continuing his investigation. *See id.* at 145.

Once outside the vehicle, the officer secured the firearm and asked the appellant for his identification and documentation permitting him to possess the firearm. *See id.* at 146. The appellant handed the officer this information, and the officer observed that the appellant's "Act 235" card, which authorized the appellant to carry the firearm, had expired. The appellant told the officer that he had another Act 235 card at home, and the officer proceeded to spend the next fifteen to twenty minutes contacting local detectives and the Pennsylvania State Police to determine whether the appellant was authorized to carry the firearm. The officer learned that the appellant's Act 235 certification had expired, and the officer arrested the appellant on charges related to the unlawful possession of a firearm. However, because the driver provided documentation supporting his statement that he had recently purchased the car, the officer did not issue a citation to the driver. *See id.* at 146.

The appellant filed a motion to suppress, and the trial court held a hearing. At the conclusion of the hearing, the trial court denied the appellant's suppression motion, and the matter proceeded to a bench trial on stipulated facts. The trial court found the appellant guilty of possessing a firearm without a license and carrying a firearm in public in Philadelphia. *See id.* (citing 18 Pa.C.S. §§ 6106 and 6108).

However, on appeal, this Court reversed holding that although the traffic stop was justified due to the suspected violation of the Motor Vehicle Code violation, the police officer was not permitted to initiate a separate investigation into the appellant and whether he possessed documentation permitting his to carry a firearm. The *Malloy* Court explained that once the police stopped the vehicle due to the missing license plate, no further investigation was required to support that finding. The officer's additional questions of the appellant, who was a backseat passenger were not "mission related," and because the officer lacked reasonable suspicion to detain the appellant and investigate his legal authority to carry a firearm, the appellant's detention violated his Fourth Amendment rights. *Malloy*, 257 A.3d at 156.

We conclude that *Malloy* is distinguishable. In the instant case, the record reflects that Trooper Kim suspected not only a violation of the Motor Vehicle Code for speeding, but when he spoke to the driver he also suspected DUI. Unlike a missing license plate or exceeding the speed limit, suspicion of DUI requires further investigation, and the traffic stop serves a further investigatory purpose. *See Commonwealth v. Walls*, 206 A.3d 537, 541 (Pa. Super. 2019); *see also Chase*, 960 A.2d at 116. As noted, authority for the seizure ends when the tasks tied to the traffic infraction are, or reasonably should have been, completed. *Malloy*, 257 A.3d at 149. However, new information obtained during the natural course of the stop may provide a lawful basis upon which to extend the stop to investigate the new suspicions. *See Chase*, 960 A.2d at 115, n.5. Here, that additional information was that

the driver's eyes were "pinpoint," coupled with the fact that the vehicle was weaving. **See** N.T., 10/22/21, at 13, 19.

During this lawful stop, while Trooper Kim was investigating the driver for possible DUI, the trooper was permitted to ask Appellee to exit the car and inquire about weapons for officer safety. **Malloy**, 257 A.3d at 150. Moreover, under the circumstances presented here, we do not conclude that Appellee was yet under arrest or subject to the functional equivalent of an arrest, and Trooper Kim was not required to provide **Miranda** warnings before asking Appellee questions related to the trooper's safety. **See Berkemer v. McCarty**, 468 U.S. 420, 439-40 (U.S. 1984) (explaining that "the usual traffic stop is more analogous to a so-called '**Terry** stop' . . . than to a formal arrest," and the questions posed are investigative rather than custodial, which does not trigger **Miranda** protections); **Malloy**, 257 A.3d at 150; **Chase**, 960 A.2d at 117. After being asked about weapons and informed that he would be subject to a pat down for officer safety, Appellee told the trooper that he possessed a firearm and did not have a permit to carry it.

As stated above, the record reveals that Trooper Kim pursued the vehicle because he initially suspected the driver was violating the Motor Vehicle Code by speeding and following another vehicle too closely. Once the trooper began to follow the subject vehicle, he noticed it was weaving within its lane of travel, and Trooper Kim testified that upon speaking to the driver, he thought the driver may be under the influence. **See** N.T., 10/22/21, at 13, 19, 20. This permitted Trooper Kim to lawfully conduct a traffic stop and

further investigate the driver for DUI. *See Malloy*, 257 A.3d at 148; *see also Chase*, 960 A.2d at 115, n.5. The circumstances presented here are distinct from the situation in *Malloy* where the officer was investigating the display of a license plate and after speaking to the driver, no further "mission related" questions were required and no further investigation warranted. *See Malloy*, 257 A.3d at 150.

Additionally, in the instant case, because the trooper saw the occupants moving about the vehicle, for safety purposes, the trooper was permitted to have the occupants exit the car and ask about the possession of weapons. *See id.* During a lawful traffic stop, where the officer observes the suspect make furtive movements and reasonably concludes that the suspect may be armed and dangerous, the officer may frisk the suspect for weapons. *See Simmons*, 17 A.3d at 403-04. However, the record does not support the trial court's conclusion that there was a "*Terry*" frisk. Rather, Trooper Kim asked Appellee to exit the car and informed him that he was going to pat him down. Appellee said he did not want a pat down, and he told the trooper that he possessed a firearm and did not have a permit.

It was at this point that Trooper Kim had probable cause to conclude that Appellant, by possessing a concealed firearm without a permit, was committing a crime. This probable cause led to the seizure of the gun and Appellee's lawful arrest, which in turn permitted a search incident to that arrest. The search incident to the arrest led to the discovery of the loaded ammunition magazine and cigarette pack containing narcotics, and the search

of the vehicle revealed drug paraphernalia. The record supports the conclusion that Trooper Kim's questions were mission related. Moreover, the record does not reveal a prolonged detention or coerciveness, and contrary to the trial court's conclusion, the record does not support the finding that pat down or *Terry* frisk occurred.

After review, we are constrained to conclude that the trial court erred in granting Appellee's motion to suppress. Appellee was a passenger in a vehicle that was lawfully stopped by Trooper Kim. During Trooper Kim's investigation of the driver for possible DUI, he asked the occupants to exit the vehicle. Prior to any custodial detention, Appellee voluntarily informed the trooper that he possessed a gun. After the lawful arrest resulting from Appellee's illegal possession of a firearm, the search incident to arrest by Trooper Kim recovered the ammunition magazine, a controlled substance, and paraphernalia. For these reasons, we reverse the trial court's order granting Appellee's suppression motion, and we remand for further proceedings.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judge Stabile joins the memorandum.

Judge Sullivan concurs in the result.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/28/2022</u>