J-A20020-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: S.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.E., A MINOR | No. 1817 EDA 2021 |

Appeal from the Dispositional Order August 30, 2021
In the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-JV-0000764-2021

BEFORE:  BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY STABILE, J.:                **FILED DECEMBER 9, 2022**

Appellant S.E. appeals from the August 30, 2021 dispositional order of the Court of Common Pleas of Philadelphia County ("juvenile court"), which adjudicated him delinquent of carrying a firearm as a minor and carrying a firearm on public streets of Philadelphia.[1]  Upon review, we affirm.

The facts and procedural history of this care are undisputed.  Briefly, following a traffic stop, the Commonwealth filed a petition alleging delinquency against Appellant, who was seventeen years old at the time of the incident, charging him with multiple violations of the Pennsylvania Uniform Firearms Act of 1995 ("VUFA"), 18 Pa.C.S.A. § 6101 *et seq*.  Appellant eventually filed a motion to suppress, asserting that the police lacked probable cause or

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 6110.1(a) and 6108, respectively.

reasonable suspicion to search him or his vehicle following the stop. As a result, Appellant sought to suppress all physical evidence recovered from the vehicle or his person. The juvenile court conducted a suppression hearing, at which the Commonwealth presented the testimony of Police Officer Carlos Diaz of the Philadelphia Police Department. N.T., Hearing, 7/21/21, at 11.

Officer Diaz testified that on July 1, 2021, at around 7:40 p.m., while on duty in a marked patrol vehicle, he observed a vehicle on Merriam and Girard Avenue, passing other vehicles on the shoulder. *Id.* Officer Diaz and his partner followed the vehicle for two blocks before activating their lights and pulling the vehicle over near Belmont Avenue. *Id.* at 11-12. Officer Diaz recalled that, upon stopping the vehicle, his partner observed the driver, who was identified as Appellant, "leaning over to the right towards the passenger's side." *Id.* at 12, 13. Officer Diaz explained:

> So we saw that it didn't have no tint or anything. So we observed it from the rear window, we're behind him. We see him leaning over towards his – what we believe to be his girlfriend at the time. He leans over towards her. I don't know if he was giving her a kiss or what he was doing but he was leaning over. So my partner and I told each other hey be careful he might be concealing a weapon in there.

*Id.* at 13 (sic). Officer Diaz testified that he approached the stopped vehicle from the driver's side. *Id.* at 14. "As soon as I approached the vehicle I see [Appellant] is nervous, shaking a little bit." *Id.* at 13. Officer Diaz then noticed a "small bulge" in front of Appellant's shirt. *Id.* at 14. According to Officer Diaz, less than five minutes elapsed from the time they approached

Appellant's vehicle to when they removed him from the vehicle. *Id.* at 17-18.

Describing what occurred after Appellant was removed from the vehicle,

Officer Diaz stated:

> We took him out. I put his hands on top of the car and then I went immediately to the front and that's where I saw a gun and [another officer] immediately grabbed his arm and we put his hands behind his back and I recovered the firearm [from the front of his waistband.]"

*Id.* at 18. Officer Diaz recalled that when he frisked Appellant, he immediately

felt the gun. *Id.* at 19. "It was a pretty big gun. It was big, it was like a 45.

It is probably a little bit bigger than mine." *Id.* At the close of the hearing,

the juvenile court denied Appellant's suppression motion and moved to

conduct an adjudicatory hearing. *Id.* at 34. There, the parties stipulated,

among other things, to the property receipt and the property receipt number.

*Id.* at 37. Specifically, the parties stipulated that a black Smith and Wesson

M & P, semi-automatic 45 caliber with 15 live rounds and one magazine was

recovered from Appellant. *Id.* at 38. The court adjudicated Appellant

delinquent of carrying a firearm as a minor and carrying a firearm on public

streets of Philadelphia.

On August 30, 2021, the juvenile court conducted a dispositional hearing

at the conclusion of which Appellant was committed to a residential facility at

the Pennsylvania Department of Public Welfare for appropriate placement.

Appellant timely appealed. The juvenile court directed Appellant to file a

Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Appellant

complied, challenging the constitutionality of the frisk. In response, the court issued a Pa.R.A.P. 1925(a) opinion.

On appeal, Appellant asserts a single issue for our review.

[I.] Did the [juvenile] court err in denying the motion to suppress physical evidence, as [Appellant] was illegally seized and frisked without reasonable suspicion that he was armed and dangerous and that criminal activity was afoot?

Appellant's Brief at 4. At the core, Appellant argues that the police lacked reasonable suspicion to frisk him under *Terry*[2] following a legitimate traffic stop.[3]

As we have explained:

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

_____

[2] *Terry v. Ohio*, 392 U.S. 1 (1968).

[3] Appellant tacitly concedes that the underlying traffic stop at issue was constitutional. Appellant's Brief at 8.

*Commonwealth v. Mbewe*, 203 A.3d 983, 986 (Pa. Super. 2019) (quotations and citations omitted). Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial. *In the Interest of L.J.*, 79 A.3d 1073, 1085 (Pa. 2013).

Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution protect the people from unreasonable searches and seizures. *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (citation omitted). The *Lyles* Court explained:

> Jurisprudence arising under both charters has led to the development of three categories of interactions between citizens and police. The first, a "mere encounter," does not require any level of suspicion or carry any official compulsion to stop and respond. The second, an "investigatory detention," permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause.
>
> In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances. . . . The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and [our Supreme] Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.
>
> [Our Supreme] Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification. Officers may request identification

> or question an individual so long as the officers do not convey a message that compliance with their requests is required. Although police may request a person's identification, such individual still maintains the right to ignore the police and go about his business.

*Id.* at 302-03 (internal citations and quotation marks omitted). "We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).

Here, it is undisputed that Officer Diaz's pat-down of Appellant amounted to an investigative detention necessitating reasonable suspicion. It is settled that reasonable suspicion necessary for investigative detentions

> is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Commonwealth v. Davis*, 102 A.3d 996, 1000 (Pa. Super. 2014) (citations omitted). In *Commonwealth v. Simmons*, 17 A.3d 399 (Pa. Super. 2011), *appeal denied*, 25 A.3d 328 (Pa. 2011), we explained that Pennsylvania has adopted the holding of *Terry*:

> [T]he *Terry* stop and frisk[] permits a police officer to briefly detain a citizen for investigatory purposes if the officer observes unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be afoot. *Terry* further held that when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close

- 6 -

range is armed and presently dangerous to the officer or to others the officer may conduct a pat down search to determine whether the person is in fact carrying a weapon. The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.

In order to conduct an investigatory stop, the police must have reasonable suspicion that criminal activity is afoot. In order to determine whether the police had reasonable suspicion, *the totality of the circumstances—the whole picture—must be considered*. Based upon that whole picture the detaining officers must have a *particularized and objective basis for suspecting the particular person stopped of criminal activity*. To conduct a pat down for weapons, a limited search or frisk of the suspect, the officer must reasonably believe that his safety or the safety of others is threatened.

*Simmons*, 17 A.3d at 403 (citations, quotation marks, brackets, and some paragraph breaks omitted) (emphasis added). In assessing the totality of the circumstances, a court must give weight to the inferences that a police officer may draw through training and experience. *Commonwealth v. Holmes*, 14 A.3d 89, 95 (Pa. 2011); *see Commonwealth v. Williams*, 980 A.2d 667, 672 (Pa. Super. 2009) (citations omitted) (noting that "[r]easonable suspicion must be based on specific and articulable facts, and it must be assessed based upon the totality of circumstances viewed through the eyes of a trained police officer."), *appeal denied*, 990 A.2d 730 (Pa. 2010).

However, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger." *Commonwealth v. Taylor*, 771 A.2d 1261, 1268-69 (Pa. 2001). In conducting a reasonable suspicion inquiry, a suppression court is required

to "afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience[.]" **Commonwealth v. Brown**, 996 A.2d 473, 477 (Pa. 2010). If weapons are found because of the pat-down search, the police officer may seize them. **Commonwealth v. Thompson**, 939 A.2d 371, 376 (Pa. Super. 2007), **appeal denied**, 956 A.2d 434 (Pa. 2008).

Instantly, based on the totality of the circumstances of this case, it is beyond peradventure that Officer Diaz had reasonable suspicion to believe that Appellant might be armed and dangerous. As the juvenile court found, and Appellant concedes, Appellant's vehicle was stopped lawfully for a Vehicle Code violation. Upon being stopped, Appellant was nervous and shaking a bit. Officer Diaz observed a small bulge under Appellant's shirt. Fearing for his safety, Officer Diaz directed Appellant out of the vehicle and patted him down.[4] As a result of the pat-down search, Officer Diaz recovered a firearm from Appellant's waistband. Juvenile Court Opinion, 12/20/21, at 3-4. Officer Diaz's pat-down search of Appellant passes constitutional muster because

---

[4] Under **Pennsylvania v. Mimms**, 434 U.S. 106 (1977), police may, as a matter of course and in the interest of their safety, "order the driver to exit the vehicle despite the lack of an articulable basis to believe that criminal activity is afoot or that the driver is armed and dangerous." **Commonwealth v. Brown**, 654 A.2d 1096, 1100 (Pa. Super. 1995). In **Mimms**, the Supreme Court explained that, once the vehicle is constitutionally stopped, "police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it." **Mimms**, 434 U.S. at 111. Standing beside one's vehicle during a traffic stop is a "mere inconvenience." **Id.** Unsurprisingly, we are not called upon to decide here whether the police had a right to order Appellant out of the vehicle.

Appellant was nervous, shaking a little and had a bulge under his shirt.  Officer Diaz, therefore, had reasonable suspicion to frisk Appellant under **Terry**.  Accordingly, under the totality of the circumstances of this case, we cannot conclude that the juvenile court erred in denying Appellant's suppression motion.

To the extent Appellant relies on **Commonwealth v. Hicks**, 208 A.3d 916 (Pa. 2019), to compel a different outcome, such reliance is inapposite.  In **Hicks**, police stopped Hicks's vehicle in a gas station parking lot based on information that he was in possession of a firearm.  **Hicks**, 208 A.3d at 922.  An officer restrained Hicks's arms and removed his handgun from his holster, and a search of the vehicle followed.  **Id.**  Police later determined that Hicks possessed a valid license to carry a concealed firearm, and he was not statutorily prohibited from possessing a firearm.  **Id.**  Thus, Hicks was not charged with firearms offenses.  **Id.**  The trial court denied suppression, reasoning that possession of a concealed weapon justifies an investigatory stop to determine whether the individual has a license.  **Id.** at 922-23.  Ultimately, the Pennsylvania Supreme Court evaluated whether carrying a concealed firearm could justify an investigative detention.  **Id.** at 934.  The Supreme Court first recognized that an individual may legally carry a concealed firearm in public if he is licensed to do so.  **Id.** at 926.  The Court further recognized that it is impossible to ascertain an individual's licensing status from his appearance.  **Id.** at 937.  Following an extensive review of applicable Fourth Amendment jurisprudence, **see id.** at 930-36, the Court

concluded that there is "no justification for the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public." **Id.** at 936. Thus, possession of a concealed firearm "alone is an insufficient basis for reasonable suspicion that criminal activity is afoot." **Id.** at 945.

First, unlike **Hicks**, the police here did not initiate an investigative detention on the grounds that Appellant was armed. Rather, it is undisputed that Appellant was stopped lawfully after having committed a violation of the Vehicle Code. Second, and most important, the **Hicks** Court specifically noted that it was **not addressing** the question of "whether a police officer who has effectuated a lawful investigative detention may treat the suspect's possession of a firearm as *per se* authorization to 'frisk' the detainee." **Id.** at 934. The Court explained that decisions involving whether an armed individual is automatically dangerous for purposes of a **Terry** frisk "have no relevance to this appeal." **Id.**

Similarly, Appellant's reliance on **Commonwealth v. Malloy**, 257 A.3d 142 (Pa. Super. 2021) also is misplaced. There, the police detained the occupants of a vehicle following a lawful traffic stop. A police officer instructed Malloy, who was seated behind the driver, to roll down the passenger window. **Id.** at 145. The officer then asked Malloy for identification. **Id.** In response, Appellant pulled out a lanyard from his hooded sweatshirt. **Id.** Upon observing the lanyard, the officer immediately asked Malloy whether he had a firearm. **Id.** The officer explained that, "in his experience, it was common

- 10 -

for people who worked in armed security positions at local bars to keep their identification badges in lanyards." *Id.* Malloy answered that he did have a firearm and worked as a security guard at Bananas—a bar—where he and the other occupants of the vehicle had just finished working for the day. *Id.* The officer eventually secured the firearm for his safety and the safety of the other occupants of the vehicle. *Id.* The officer, thereafter, questioned Malloy regarding his firearm licensure status and, over the next 15 to 20 minutes, ran checks on Malloy to determine whether had a valid license to carry. *Id.* at 146. The officer determined that Malloy did not have a valid license. *Id.* The officer then arrested Malloy on charges related to the unlawful possession of a firearm. *Id.*

On appeal, a panel of this Court concluded that the trial court erred in failing to grant Malloy's suppression motion. We explained:

> [O]nce [the officer] secured the firearm, [Malloy's] legal authority to own or possess a gun clearly bore no discernable relationship to individual safety or security within the context of the traffic stop. Under these circumstances, where seizure of a firearm has substantially diminished the risk to officers and others who may be present during a lawful vehicle detention, we see no reason why the Fourth Amendment, in the absence of independent justification, suspicion, or cause, should tolerate even a 10- to 15- minute extension of a routine traffic stop for the investigation of a secondary criminal matter.

*Id.* at 153.

Instantly, by contrast, and as noted, the police did not initiate an investigative detention on the grounds that Appellant was armed. Rather, it is undisputed that Appellant was stopped lawfully after having committed a

- 11 -

violation of the Vehicle Code. Officer Diaz immediately noticed a small bulge in Appellant's shirt, which Officer Diaz believed could be a firearm. Fearing for his own safety and for the safety of other officers, Officer Diaz directed Appellant from the vehicle and patted him down, resulting in the recovery of a firearm from Appellant's waistband.

The facts of *Malloy* align with **Hicks**. Unlike here, but like **Hicks**, the appellant in *Malloy* was detained only after the officer learned that he possessed a firearm. We determined that any questions posed to Malloy regarding his firearms licensure status were not incidental to the underlying traffic stop.[5] Separately, unlike the officer in *Malloy*, Officer Diaz never

---

[5] In *Malloy*, we rejected the trial court's conclusion that the officer's request for Malloy's documented firearms authorization could be pursued as incidental to the traffic stop.

> Here, neither the trial court nor the Commonwealth cite legal authority which equates an investigation of a passenger's documented authority to carry a firearm to the incidental inquiries permitted during a lawful traffic stop under [**Rodriguez v. U.S.**, 135 S. Ct. 1609, 575 U.S. 348 (2015)] and which promote safe and financially responsible operation of motor vehicles. More tellingly, neither the trial court nor the Commonwealth offer any explanation as to how or why a passenger's firearms licensure status relates to these incidental inquiries or, more broadly, to the safe and financially responsible operation of a motor vehicle in general. We are convinced that a passenger's legal authority to own or possess a firearm is simply unrelated to a driver's authority to operate a motor vehicle, the existence of outstanding warrants against the driver, and whether a lawfully detained vehicle is properly registered or insured.

*Malloy*, 257 A.3d at 152.

conducted an independent investigation into Appellant's firearm licensure status during the traffic stop. Appellant's reliance on ***Malloy*** is misplaced.

Dispositional order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/9/2022