J-A26015-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KALIFF RIVERS | : | |
| | : | |
| Appellant | : | No. 2911 EDA 2022 |

Appeal from the Judgment of Sentence Entered October 19, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005108-2021

BEFORE: DUBOW, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY DUBOW, J.:           **FILED MARCH 13, 2024**

Appellant, Kaliff Rivers, appeals from the October 19, 2022 judgment of sentence entered in the Philadelphia County Court of Common Pleas following his conviction for Possession of a Firearm by a Prohibited Person, Carrying a Firearm Without a License, and Carrying a Firearm in Public in Philadelphia.[1] Appellant challenges the denial of his pre-trial motion to suppress evidence and the sufficiency of the evidence supporting his convictions. After careful review, we affirm.

**A.**

The relevant facts and procedural history are as follows. On January 6, 2021, at 7:30 PM, Philadelphia Police Officers Christopher Ficchi and Kyle Smith were on patrol near 59th and Vine Streets when they observed a silver

---

[1] 18 Pa.C.S. §§ 6105(a)(1), 6106(a)(1), and 6108, respectively.

Honda sedan with a non-functioning taillight. The officers stopped the sedan to conduct a vehicle investigation.

After stopping the vehicle, Officer Ficchi went to the driver's side and Officer Smith went to the passenger side. The vehicle had four occupants: the driver Cherie Davis, an unnamed female front-seat passenger, Appellant in the rear driver's-side seat, and Zamir Jackson in the rear passenger-side seat.

While speaking with Ms. Davis, Officer Ficchi noticed the smell of marijuana and questioned her about it. In response, she showed him a marijuana cigar. During this conversation, Officer Ficchi heard Officer Smith telling Appellant "several times. . .to stop moving around. Keep his hands still." N.T. Suppression, 10/5/21, at 12. At that point, Officer Ficchi saw that Appellant's hands were "by his waistband." *Id.* As a result, Officer Ficchi decided to remove all passengers from the vehicle "for officer's [*sic*] safety." *Id.* at 12. Because the vehicle was a two-door sedan, the driver needed to step out before police could remove Appellant. Once she stepped out, Officer Ficchi moved the seat forward, removed Appellant, and frisked his waistband for weapons, but did not find any. Officer Smith then brought Appellant to the police car while the other passengers remained in the vehicle.

Officer Ficchi then returned to the vehicle and looked inside with his flashlight. He saw a black revolver on the floor behind the driver's seat, so he told Officer Smith to handcuff Appellant. Then, Officer Ficchi observed the car "kind of like shake," and saw Mr. Jackson attempting to exit the vehicle

through the driver's side door, where the firearm was. *Id.* at 13. He stopped Mr. Jackson, recovered the firearm, and then secured Mr. Jackson.

The Commonwealth charged Appellant with the above charges.[2] On October 5, 2021, the trial court held a suppression hearing, during which Officer Ficchi testified in accordance with the above facts. He also described the area where the stop occurred as a "[h]igh crime" area, and stated that, based on his experience of having made approximately 100 firearms arrests, individuals usually keep their firearms in their waistbands. *Id.* at 16.

The court held the motion under advisement before denying it on October 19, 2021. Appellant then proceeded to a bifurcated bench trial on November 16 and 29, 2021.

The Commonwealth presented three witnesses. First, Officer Smith testified that, during the stop, Appellant was initially leaning forward with his hands between his legs, and when he told Appellant to let him see his hands, Appellant leaned back, then leaned forward again. Officer Smith explained that he had told Appellant several times to keep his hands visible and to stop moving and that, by the third or fourth time, Officer Ficchi asked Appellant to step out of the vehicle. Officer Smith described Appellant as "fidgety." N.T. Trial, 11/16/21, at 11.

Next, Detective Jonathan Eves testified, describing how he swabbed the recovered firearm for DNA: once he received the firearm from Officers Ficchi

_____

[2] The officers did not issue Ms. Davis a citation for the taillight or marijuana.

and Smith, he swabbed the trigger, trigger guard, handle, and cylinder. Then, he testified that he sealed, signed, and dated the swab before sending it to the DNA lab. He also clarified that he used one swab for the entire firearm, so it would be impossible to determine where on the firearm any DNA was found.

The Commonwealth's final witness was Lynn Hainowitz, a forensic scientist with the Philadelphia Police Department. Following stipulations that she is an expert in DNA analysis, she testified generally to the DNA testing and comparison process. She further testified that another analyst tested the DNA from the swab of the firearm and from Appellant, and then she analyzed the resulting data and prepared a report summarizing her findings. She concluded that the firearm swab contained DNA from at least three different individuals, at least one of whom was male. Furthermore, she found that Appellant's full DNA profile, all alleles from his sample, were also present in the sample taken from the firearm. She also performed a statistical analysis and determined that:

> [u]nder the scenario that this DNA mixture originates from [Appellant] and two random unrelated individuals. It is 3.153 quadrillion times more likely to occur than if it originates from three random unrelated individuals in the Caucasian population; 23.09 trillions times more likely to occur than if it originates from three random unrelated individuals in the African-American population; and 699.6 trillions times more likely to occur than if it originates from three random unrelated individuals in the Hispanic population.

N.T. Trial, 11/16/21, at 31-32.  When asked to describe what she meant in "basic terms," she explained:

> [s]o because of the nature of the mixture this mixture couldn't be flushed out to determine specific individual profiles.  So the type of statistics that we are able to do with this type of mixture compares two distinct scenarios and says which one of these is more likely to result in the mixture that was obtained.  So the first scenario was that it's from [Appellant] and two random individuals.  The second scenario is just three random unrelated individuals.  And in every calculation it was more likely that the mixtures [were] from [Appellant] and two random unrelated individuals to the numbers that were previously stated.

*Id.*  Finally, Appellant's counsel asked Ms. Hainowitz whether Appellant's DNA could have been transferred via secondary transfer.[3]  She stated that she did not think an entire DNA profile would transfer via secondary transfer unless "you're dealing with transferring large amounts of bodily fluid."  N.T. Trial, 11/29/21, at 11.

Appellant then testified, stating that he knew Mr. Jackson but not the other occupants, and that they were driving to a candlelight vigil.  He explained that, when the others picked him up, Mr. Jackson was already in the rear driver's side seat, but that he moved so that Appellant could sit there.  He also testified that all four occupants shared a marijuana blunt.

---

[3] Secondary transfer would be, for example, if Appellant smoked the marijuana cigar, then another passenger touched it, therefore touching Appellant's saliva, then touched the firearm, that passenger might transfer some of Appellant's DNA to the firearm.  *See* N.T. Trial, 11/29/21, at 15-16, 20.  Ms. Hainowitz testified that she would not expect a person's full DNA profile to transfer to the firearm in that situation.

Appellant further testified that, during the traffic stop, Officer Smith told him to put his hands up, and he asked Officer Smith if he was recording. He explained that, since Officer Smith said no, he attempted to pull out his cell phone to record the stop. He testified that he put one hand up, then tried to get his cell phone with his other hand, and at that point, Officer Ficchi ordered him out of the car. Finally, Appellant maintained that he had not seen the firearm.

The parties stipulated that (1) detectives swabbed Appellant's DNA on January 7, 2021 and submitted it to the DNA lab; (2) the firearm was operable; (3) Appellant had a prior conviction that rendered him ineligible to possess a firearm or obtain a license; and (4) that Zamir Jackson was the other rear passenger that night, that he had prior conviction for Robbery and Possession of a Firearm by a Prohibited Person, and that he was on probation for the latter at the time of this incident.

On November 29, 2021, the court found Appellant guilty of all charges. The court ordered presentence investigation ("PSI") and mental health reports. After several continuances, the court sentenced Appellant on October 19, 2022, to an aggregate term of 5 to 15 years' incarceration.[4] Although he

---

[4] The court sentenced to Appellant 5 to 15 years' incarceration for Persons Not to Possess Firearms, with concurrent sentences of 4 to 8 years' incarceration for Carrying a Firearm Without a License, and 1 to 2 years' incarceration for Carrying Firearms in Public in Philadelphia. Additionally, this conviction constituted a violation of probation ("VOP") on two other dockets. Appellant received concurrent incarceration sentences for the VOPs, which are not before us in this appeal.

had counsel, Appellant untimely filed a *pro se* post-sentence motion on November 1, 2022.  The trial court did not rule on the post-sentence motion.

**B.**

Appellant timely filed a notice of appeal.  Both he and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

I.      Did the lower court err in denying [Appellant's] suppression motion, where the officers unnecessarily prolonged a traffic stop to conduct an unrelated investigation and eventually recovered a gun from a vehicle that the officers had no right to enter?

II.     Was the evidence insufficient to prove that [Appellant] possessed a handgun recovered from a vehicle with three other occupants?

Appellant's Br. at 5.

**C.**

In his first issue, Appellant asserts that the court erred in denying his motion to suppress.  *Id.* at 12.  "Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct."  *Commonwealth v. Evans*, 153 A.3d 323, 327 (Pa. Super. 2016) (citation omitted).  "Once a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights."  *Commonwealth v. Wallace*, 42 A.3d

1040, 1047–1048 (Pa. 2012). *See also* Pa.R.Crim.P. 581(H). We may only consider the prosecution's evidence and the defense's uncontradicted evidence, as presented at the suppression hearing. *Commonwealth v. Eichinger*, 915 A.2d 1122, 1134 (Pa. 2007). "Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Id.*

\*

Appellant first maintains that the court erred in denying his motion to suppress because the officers "unlawfully prolonged the traffic stop beyond the time necessary to deal with the broken taillight."[5] Appellant's Br. at 13-15. Specifically, he asserts that the officers "clearly had no intention of" issuing a citation for the broken taillight or arresting the driver for marijuana possession, but instead were "investigating other potential crimes" without reasonable suspicion. *Id.* at 13, 15.

A police officer may initiate a traffic stop if he has reason to believe that a violation of the vehicle code has occurred. *Commonwealth v. Brown*, 64 A.3d 1101, 1105 (Pa. Super. 2013). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Commonwealth v. Malloy*, 257 A.3d 142, 149 (Pa. Super.

---

[5] Appellant does not dispute that the officers were justified in stopping the vehicle.

2021) (citation and quotation marks omitted).  Regarding safety concerns, we have held that:

> tasks relating to officer safety are also part of a traffic stop's mission when done purely in an interest to protect the officers. This safety interest stems from the fact that '[t]raffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely.'

***Commonwealth v. Ross***, 297 A.3d 787, 792–93 (Pa. Super. 2023) (citations omitted).  To ensure officers' safety during a traffic stop, police may order both drivers and passengers to exit the vehicle, even without reasonable suspicion that criminal activity is afoot.  ***Malloy***, 257 A.3d at 150.

Here, the trial court found that "Appellant's noncompliance presented an additional, legitimate reason to prolong the detention and continue the investigation of the vehicle," and that Officer Ficchi properly ordered Appellant out of the vehicle to ensure officer safety.  Trial Ct. Op., 5/19/2023, at 13. We agree.

Although Appellant argues that there was no reasonable suspicion to prolong the traffic stop, police do not need reasonable suspicion to take actions to ensure their safety, such as ordering passengers out of the vehicle. Appellant's Br. at 12-13; ***Malloy***, 257 A.3d at 150.  The evidence from the suppression hearing indicated that, while the traffic stop was ongoing, the officers had reason to fear for their safety: the stop occurred in a high crime area; Appellant failed to comply with Officer Smith's directions that he stop moving around and keep his hands still; and he had his hands near his waistband where, in Officer Ficchi's experience, individuals often keep their

firearms. Therefore, the officers did not improperly prolong the traffic stop, but rather took appropriate actions to ensure their safety in response to Appellant's noncompliance.

*

Appellant also claims that the court erroneously denied suppression because the Commonwealth failed to establish the plain view exception to the warrant requirement, specifically the second and third prongs.[6] Appellant's Br. at 15-17.

We decline to address Appellant's challenge because we agree with the Commonwealth's argument that the officers were justified in seizing the firearm for their safety. *See* Commonwealth's Br. at 12, 14; *Commonwealth v. Hamlett*, 234 A.3d 486, 488 (Pa. 2020) (reiterating that an appellate court may affirm for any reason supported by the record).

Police may search "the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden[]" if they

---

[6] "The plain view doctrine allows the admission of evidence seized without a warrant when: (1) an officer views the object from a lawful vantage point; (2) it is immediately apparent to him that the object is incriminating; and (3) the officer has a lawful right of access to the object." *Commonwealth v. Davis*, 287 A.3d 467, 471 (Pa. Super. 2022) (emphasis omitted). The Commonwealth must satisfy all three prongs to support a warrantless seizure based on the plain view doctrine. *Commonwealth v. Miller*, 56 A.3d 424, 430-31 (Pa. Super. 2012). Appellant does not challenge that the Commonwealth met the first prong but asserts that it failed to meet the second and third prongs. Appellant's Br. at 16. The trial court addressed Appellant's plain view challenge and found that the Commonwealth met all three prongs. *See* Trial Ct. Op. at 14.

possess "a reasonable belief. . .that the suspect is dangerous and the suspect may gain immediate control of weapons." ***Commonwealth v. Rosa***, 734 A.2d 412, 415 (Pa. Super. 1999) (citing ***Michigan v. Long***, 463 U.S. 1032, 1049 (1983)).[7] Moreover, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger." ***Commonwealth v. Cooper***, 994 A.2d 589, 592 (Pa. Super. 2010) (citation omitted).

In ***Rosa***, this Court held that a ***Terry*** protective sweep of a vehicle, resulting in the discovery of two firearms, was lawful where police stopped the vehicle at night, there were three occupants but only two officers, several knives and arrows were visible, and a passenger engaged in furtive movements. The Court noted that the sweep was necessary for officers' safety, and therefore legal, because there were multiple suspects and a risk of them reaching weapons, either by breaking away from the officers or once they were allowed back into the vehicle. ***Rosa***, 734 A.2d at 419. ***See also Commonwealth v. Morris***, 644 A.2d 721, 723 (Pa. 1994) (protective sweep justified where appellant was leaning to the right and towards the floor and "reaching quickly between his legs when [] ordered to place his hands on the steering wheel," consistent with concealing or reaching for weapon, and officer

---

[7] In ***Long***, the United States Supreme Court "extended to automobiles the protective search authorized with regard to persons in [] ***Terry v. Ohio***, 392 U.S. 1 [](1968)." ***Rosa***, 734 A.2d at 415.

saw a metal pipe after removing appellant from the car); *Commonwealth v. Buchert*, 68 A.3d 911, 916–17 (Pa. Super. 2013) (protective sweep justified due to "[a]ppellee's furtive movement of leaning forward and appearing to conceal something under his seat, along with his extreme nervousness and the nighttime stop[.]"). Furthermore, a protective sweep may still be warranted even though the defendant is under the control of a backup officer away from the vehicle. *Rosa*, 734 A.2d at 416-17.

Here, the officers had a reasonable belief that Appellant was attempting to conceal a weapon due to his furtive movements and failure to follow commands. Furthermore, there were four occupants in total, but only two officers present. Although the driver was outside of the vehicle and Appellant was under the control of Officer Smith, two passengers remained in the vehicle and there was a risk that they could gain control of the firearm. In fact, Officer Ficchi recovered the firearm, and secured Mr. Jackson, because Mr. Jackson attempted to exit the vehicle through the drivers' side door, thereby moving towards the firearm. For officer safety, Officer Ficchi was permitted to recover and secure the firearm to ensure that the remaining passenger could not access it.

Therefore, Appellant's argument that the officers were not justified in seizing the firearm lacks merit. We conclude that the court correctly denied suppression.

**D.**

Appellant next challenges the sufficiency of the evidence supporting his convictions, asserting that the Commonwealth did not prove the element of possession with sufficient evidence. Appellant's Br. at 17-18. Although he does not specify which charge, we deduce that he is challenging the possession element of all three charges.[8]

We apply the following well-settled precepts. "A claim challenging the sufficiency of the evidence is a question of law." ***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000). Our standard of review is *de novo*, and our scope of review is limited to the evidence admitted at trial viewed in the light most favorable to the Commonwealth as verdict winner. ***Commonwealth v. Rushing***, 99 A.3d 416, 420-21 (Pa. 2014). The Commonwealth may sustain its burden of proof by solely circumstantial evidence. ***Commonwealth v. Lehman***, 820 A.2d 766, 772 (Pa. Super. 2003).

In reviewing a sufficiency challenge, we determine "whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all elements of the offense beyond a reasonable doubt." ***Commonwealth v. May***, 887 A.2d 750, 753 (Pa. 2005). The

---

[8] All three charges have, as an element, that a person is in possession of or carrying a firearm. 18 Pa.C.S. §§ 6105(a)(1), 6106(a)(1), and 6108. While each charge has other elements, Appellant only challenges possession. ***See generally***, Appellant's Br. at 17-18.

factfinder, "while passing on the credibility of the witnesses and the weight of the evidence—is free to believe all, part, or none of the evidence." *Commonwealth v. Miller*, 172 A.3d 632, 640 (Pa. Super. 2017). "In conducting this review, the appellate court may not weigh the evidence and substitute its judgment for the fact[]finder." *Id.*

Regarding possession, we have held that the Commonwealth may prove actual possession, constructive possession, or joint constructive possession. *Commonwealth v. Parrish*, 191 A.3d 31, 36 (Pa. Super. 2018). If a defendant is not in actual possession of contraband, the Commonwealth must establish that he had constructive possession. *Commonwealth v. Hopkins*, 67 A.3d 817, 820 (Pa. Super. 2013). "We have defined constructive possession as conscious dominion[,]" meaning "the power to control the contraband and the intent to exercise that control." *Id.* (citation omitted). This Court has held that the Commonwealth may establish constructive possession by the totality of the circumstances. *Id.* Furthermore, "knowledge of the existence and location of the contraband is a necessary prerequisite to proving the defendant's intent to control, and, thus, his constructive possession." *Parrish*, 191 A.3d at 37.

Finally, it is well established that constructive possession may be proven by circumstantial evidence. *Commonwealth v. Haskins*, 677 A.2d 328, 330 (Pa. Super. 1996). *See also Commonwealth v. Cruz Ortega*, 539 A.2d 849, 851 n.1 (Pa. Super. 1988) (holding that evidence was sufficient to

establish constructive possession when police observed appellant leaning over in his seat then found contraband under his seat).

*

Appellant argues that the Commonwealth failed to put forth sufficient evidence that he, rather than another passenger, possessed the firearm. Appellant's Br. at 17. Specifically, he avers that there were at least three individuals' DNA on the firearm, that his DNA could have been present on the firearm because another passenger transferred it there or because he simply brushed against it, and that the Commonwealth's expert "conceded" that secondary transfer was possible. *Id*. at 17-18. Finally, he argues that the firearm could have belonged to any of the other passengers, including the other backseat passenger, Mr. Jackson, who had a history of violent crime and illegal firearm possession. *Id*. at 17.

In concluding that the evidence was sufficient, the trial court relied on the totality of the circumstances: Appellant's noncompliance with Officer Smith's instructions that he stop moving and his "leaning forward with his hands between his legs," the fact that Officer Ficchi found the firearm on the floor near where Appellant's feet had been, and the presence of Appellant's DNA. Trial Ct. Op. at 19. The court also emphasized that Ms. Hainowitz reiterated nine times that secondary transfer of Appellant's full profile was unlikely in this scenario. *Id.* Ultimately, the court concluded that the evidence was sufficient to establish beyond a reasonable doubt that Appellant, not one of the other passengers, constructively possessed the firearm. *Id.*

Appellant essentially argues that the trial court should have considered that his DNA was not transferred to the firearm because Appellant touched the firearm, but because he transferred his DNA to another person who touched the firearm. Appellant's Br. at 18. However, the trial court credited Ms. Hainowitz's testimony that secondary transfer of Appellant's full profile was unlikely. We may not reweigh the evidence or substitute our judgment for the factfinder. *Miller*, 172 A.3d at 641.

Viewed in the light most favorable to the Commonwealth as verdict winner, the evidence shows that Appellant possessed the firearm: he leaned forward and placed his hands between his legs after being told to stop moving, and police subsequently found the firearm on the floor near where his feet had been, and where he had leaned. N.T. Trial, 11/16/21, at 9. Moreover, Ms. Hainowitz's testimony indicated that it would be unlikely for Appellant's full DNA profile to appear on the firearm due to secondary transfer. N.T. Trial, 11/29/21, at 11.

Finally, we are not persuaded by Appellant's argument that the firearm belonged to Mr. Jackson due to his criminal record because the evidence supports that it was Appellant who possessed and attempted to conceal the firearm. Appellant's Br. at 18. Due to Appellant's furtive movements, including towards the area where the firearm was later found, the court drew a reasonable inference that it was Appellant who possessed the firearm.

The totality of the circumstances indicates that Appellant possessed the firearm. Therefore, we conclude that the evidence was sufficient to sustain Appellant's convictions.

**E.**

We conclude that the trial court correctly denied Appellant's motion to suppress and that the evidence was sufficient to support his convictions. Accordingly, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date:  3/13/2024